[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14294
_____

D.C. Docket No. 4:16-cr-10050-KMM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TRINITY ROLANDO CABEZAS-MONTANO,
ADALBERTO FRICKSON PALACIOS-SOLIS,
HECTOR LEONARDO GUAGUA-ALARCON,

Defendants-Appellants.
_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(January 30, 2020)

Before ROSENBAUM, TJOFLAT and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, defendants Trinity Rolando Cabezas-Montano, Hector

Leonardo Guagua-Alarcon, and Adalberto Frickson Palacios-Solis appeal their

convictions and sentences under the Maritime Drug Law Enforcement Act ("MDLEA").  See 46 U.S.C. §§ 70501-70508.  They were convicted of conspiracy to possess with intent to distribute over five kilograms of cocaine while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70506(b), and possession with intent to distribute over five kilograms of cocaine while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70503(a)(1).

As to their convictions, the defendants, either together or separately, challenge: (1)  the constitutionality of the MDLEA; (2) the district court's determination of MDLEA subject matter jurisdiction; (3) the delay in presentment for a probable cause hearing; (4) the denial of their motion in limine to exclude evidence of post-arrest, pre-Miranda[1] silence; (5) the sufficiency of the evidence; and (6) the denial of their motions for a mistrial based on the government's alleged Brady[2] violation.  As to their sentences, the defendants, either together or separately, challenge: (1) the constitutionality of the denial of safety-valve relief in their MDLEA case; (2) the denial of a minor-role reduction; and (3) the denial of their motions for a downward variance.  They also claim the sentencing court committed procedural error and imposed substantively unreasonable sentences.

---

[1]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[2]Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).

After careful review of the record and the parties' briefs, and with the benefit of oral argument, we affirm the defendants' convictions and sentences. We start by recounting the trial evidence about the defendants' crimes.[3]

## I. FACTUAL BACKGROUND

### A.    Coast Guard's Detection of the Go-Fast Vessel

On the night of October 24, 2016, the U.S. Coast Guard cutter Hamilton was patrolling in the eastern Pacific Ocean at 10 degrees latitude and 91 degrees longitude, which was approximately 200 miles off the coast of Central America, namely Guatemala and El Salvador. During the patrol, around 9:05 p.m., a Coast Guard marine patrol aircraft notified the Hamilton cutter that it had detected a go-fast vessel ("GFV") that was traveling northbound at a high rate of speed and was approximately six nautical miles away from the cutter.[4]

The target GFV was 30-to-35 feet long, had two outboard engines, and was carrying three passengers on board. GFVs, also known as a "Panga" or "Panga-style" vessels, are small vessels designed to cut through the water with less friction so that they can travel at higher speeds. GFVs are low-profile and have a very

---

[3]While there were two jury trials, the first resulted in a mistrial. The facts we recount are based on the evidence from the second jury trial.

[4]Coast Guard personnel testified that, while at sea, they use an international military unit of time called "Zulu." While it was 9:05 p.m. on October 24, local time when the Coast Guard aircraft contacted the Hamilton cutter, under Zulu time it was 2:05 a.m. on October 25. To avoid confusion, we will refer to local time.

different shape, style, and speed than a fishing boat.  Drug smugglers commonly use GFVs to transport drugs and travel at night without navigation lights to avoid detection.

After being notified of the GFV, the Hamilton crew met for a briefing in the cutter's Combat Information Center ("CIC").  The CIC was equipped with a Forward-Looking Infrared Radar ("FLIR") system and various other radars that enabled the Coast Guard to monitor nighttime vessel activity on the high seas.  The FLIR system uses heat-based infrared detection to create a video in black (the objects emitting more heat) and white (the objects emitting less heat) depicting the activities or objects being monitored.  The FLIR system allowed the Coast Guard to see vessels, passengers, and any jettisoned objects at night.

Generally speaking, Coast Guard members in the CIC stay in contact with all other Hamilton units throughout interdictions and keep them updated on the course and distance of target vessels.  The three Hamilton units included (1) a helicopter, (2) an over-the-horizon ("OTH") vessel, and (3) a long-range interceptor ("LRI") vessel.  The helicopter also was equipped with a FLIR monitoring system that recorded its observations on video too.  The OTH vessel was equipped with search lights, radar, and weapons.  The crew on these Hamilton units were equipped with and used night-vision goggles.

After the CIC briefing, the Hamilton crew decided to dispatch all three

4

units—the helicopter, OTH vessel, and LRI vessel—to intercept the target GFV. At launch time, it was very dark due to lack of moonlight, but the weather and sea conditions were calm and without wind.

## B.    Helicopter Chase

At 9:34 p.m., the <u>Hamilton</u> helicopter launched.  At 9:45 p.m., the helicopter located the 30-to-35-foot GFV with two outboard engines that was carrying three individuals.  The GFV appeared to be "dead-in-water" but started moving again.[5] The helicopter moved alongside the GFV.  At this point, the GFV and the helicopter still were approximately 200 to 250 nautical miles from the coast of Central America.  The CIC on the <u>Hamilton</u> cutter eventually picked up the GFV on its FLIR and other radar systems and continuously monitored it.

While pursuing the GFV, the <u>Hamilton</u> helicopter crew obtained a statement of no objection from Coast Guard headquarters, entitling it to request that the vessel stop and to fire warning and disabling shots if necessary.  The helicopter crew broadcasted orders in English and Spanish for the GFV to stop, ordered the passengers to put their hands up and move to the front of the vessel, and flashed its blue law enforcement lights and Coast Guard emblem.  The GFV disregarded the instructions and continued moving in an evasive, zig-zag path.  This prompted the helicopter crew to continue its chase and to fire three rounds of warning shots.

---

[5]"Dead-in-water" means that the vessel has stopped and is motionless in the water.

5

Every fifth round that the helicopter crew fired contained a "tracer round," a large and easily-visible red glow that detached from the projectile before entering the water. The GFV continued to disobey the orders.

As the helicopter continued to chase the GFV, its crew saw the GFV's passengers jettisoning packages overboard. One package remained attached to the vessel and dragged behind in the water. The helicopter crew marked the location where the packages were jettisoned with chemical lights and relayed the coordinate positions to the Hamilton cutter. The helicopter FLIR video showed that the GFV's left side engine was cooler than the right side engine.

The GFV slowed down and came to a stop, at which point the passengers appeared to crank the engines to restart them. The GFV began moving again. Because the GFV passengers were next to the vessel's engines, the helicopter crew fired two rounds of warning shots near the aft of the GFV to get them to move toward the front of the vessel. The passengers complied, but the helicopter crew was unable to fire disabling shots at the GFV's engines without endangering the passengers. At this point, the helicopter was running low on fuel, so it communicated to the Hamilton cutter the GFV's last-known coordinate position and headed back to the cutter to refuel. Around 11:00 p.m., the helicopter crew lost its visual of the GFV and landed back at the Hamilton cutter at 11:05 p.m.

**C.    OTH and LRI Vessel Searches and Recovery of a Cocaine Bale**

6

Around 10:00 p.m., the OTH vessel launched.  After the helicopter headed back to the Hamilton cutter, the OTH vessel spent 20 to 30 minutes searching the area that the helicopter crew indicated was the last known coordinate location of the GFV but was unsuccessful.  The Hamilton cutter instructed the OTH crew to suspend its search for the GFV and instead head to the scene of the jettisoned packages.  The OTH crew found the chemical lights left by the helicopter crew and searched the area but found no packages.

Approximately 31 minutes after the helicopter crew lost its visual of the GFV, the Hamilton cutter reacquired the GFV's location using its CIC's FLIR and other radar systems.  The Hamilton cutter crew observed on the CIC's FLIR system that the GFV was dead-in-water and that one of the passengers was flailing and frantically trying to fix the engine.  The cutter crew informed the OTH crew that it had reacquired sight of the GFV and redirected the OTH vessel to that coordinate position.  While en route to the specified location, the OTH crew recovered a 20-kilogram cocaine bale floating in the water along with a buoy tied to a black line.  The OTH crew relayed to the Hamilton cutter the coordinate location of the recovered cocaine bale and continued its search for the GFV.

While the OTH crew was recovering the bale, the LRI vessel launched around 11:33 to 11:43 p.m.  Soon thereafter, the Hamilton cutter instructed the OTH crew to resume its search for the jettisoned packages because the LRI vessel

7

had reached the GFV and was preparing to approach. The <u>Hamilton</u> cutter crew observed the LRI's approach of the GFV on the CIC's FLIR system. Meanwhile, the OTH crew searched for about two hours but recovered no additional bales. Samples of the recovered bale's contents, which consisted of 20 individually wrapped 1-kilogram packages, field-tested positive for cocaine.

**D.    LRI Crew's Boarding and Search of the GFV**

The LRI vessel approached a dead-in-water GFV that had two outboard engines and three passengers. The GFV, which had no navigation lights, was in international waters, 200-plus miles away from the closest land mass. The LRI vessel illuminated its blue law enforcement light and announced over a loud hailer in English and Spanish, "United States Coast Guard, put your hands in the air and move towards the front of the vessel." The GFV's passengers complied with these orders.

After receiving permission for right-of-visit boarding, a boarding team from the LRI vessel then boarded the GFV. While conducting an initial safety sweep, the LRI boarding team members observed that much of the GFV had been wiped down with fuel.

The LRI boarding team, which included a Spanish translator, began asking right-of-visit questions to determine the nationality of the vessel. The team noticed the vessel was not flying any flag and had no other indicia of nationality. The team

8

twice asked the GFV's passengers if anyone wished to make a claim of nationality for the vessel.  The passengers—Cabezas-Montano, Guagua-Alarcon, and Palacios-Solis—did not respond either time.  When asked to identify the master of the vessel, the defendants did not respond.  When asked a second time, Guagua-Alarcon and Palacios-Solis pointed to Cabezas-Montano, who in turn pointed to Palacios-Solis.  The boarding team asked Cabezas-Montano and Palacios-Solis if either of them was the master, but they did not answer and continued to point at each other.  The LRI boarding team concluded that there was no claim of nationality for the vessel and that no one claimed to be the master.

When asked about the GFV's last port of call, Palacios-Solis stated that it was Manta, Ecuador.  According to one LRI boarding team member, without a claim of nationality for the vessel or a master to take the claim from, the Coast Guard "take[s] the last port of call as the nationality of the vessel."  The boarding team also observed an Ecuadorian maker's mark on the back of the GFV indicating that the vessel was manufactured in Ecuador.  When asked about the date of last port of call, Palacios-Solis stated that he and the other two defendants had gone fishing but ended up lost at sea for 32 days.  The team observed, however, that the defendants did not seem happy to see Coast Guard personnel and declined the Coast Guard's offer of food and water.

The LRI boarding team conveyed to the Hamilton cutter that the GFV bore

9

an Ecuadorian maker's mark and that its last port of call was in Ecuador.  The Hamilton cutter contacted Ecuador to obtain a statement of no objection to permit the U.S. Coast Guard to conduct a full law enforcement boarding.  According to the Coast Guard personnel's testimony, a foreign government, in response to the Coast Guard's request for a statement-of-no-objection, could claim the vessel and deny boarding, make no claim, or claim the vessel and permit boarding.  Here, Ecuador provided its statement of no objection to a Coast Guard Flag Officer early on the morning of October 25.  The LRI boarding team detained the defendants, placed them on the LRI vessel, and began its full boarding onto the GFV.

The LRI boarding team swabbed the GFV's surfaces that were not saturated with fuel and the defendants' hands for trace quantities of drugs.  The defendants appeared visibly concerned when the swabbing began.  Ultimately, the Coast Guard found trace amounts of drugs: (1) one defendant tested positive for trace amounts of cocaine and PCP; and (2) trace amounts of cocaine were detected on the GFV's bow and tiller.

The LRI boarding team also conducted a full search of the GFV.  The team found: (1) a buoy and black line similar in appearance to the buoy and black line that were recovered where the jettisoned cocaine bale was found; (2) the same brown packing tape that was wrapped around the recovered bale; (3) eleven 25-gallon fuel drums, most of which were full; (4) a phone charger; (5) a satellite

10

phone battery; (6) a document containing satellite phone numbers; and (7) a document containing coordinates.  Although no phones were on board, a team member testified that drug smugglers in GFVs sometimes throw their electronic equipment overboard to prevent the Coast Guard from recovering stored data.  The team observed a wet shirt covering the left engine, which lessened the engine's heat signature and made detection more difficult.

As to the defendants' fishing trip story, the LRI boarding team found fishing hooks and knives but did not find any bait, fish, or remnants of fish.  The team found lines, but they appeared to be unserviceable and not usable for fishing.  The team also found large quantities of water and sports drinks, as well as fresh fruit and food items that did not appear to be 32 days old.  The bottom of the GFV appeared extremely clean and free from growth, which was an unusual state for a vessel that was allegedly adrift at sea for 32 days.

After being onboard for 12 hours, the LRI crew left the GFV and sank the vessel because it was a navigation hazard.  The LRI vessel headed back to the Hamilton cutter, where the defendants were taken for processing.

### E.    Coast Guard's Recovery of 24 More Cocaine Bales

After conducting a drift analysis based on factors such as current and wind movement to determine where to search for the jettisoned packages, the OTH vessel dispatched in the daytime, responded to the designated area, and recovered

11

24 additional bales along with buoys equipped with GPS trackers. The 25 total recovered bales collectively weighed 614 kilograms. Lab testing, based on a representative 10-kilogram sample, confirmed that the substance in the recovered bales was cocaine. The tested sample had an estimated purity level of 86 and 89 percent, which was very high and indicated that the drugs were close to their original source. The cocaine bales' total wholesale value was over $10 million.

The Coast Guard also found GPS trackers attached to some of the cocaine bales themselves, which charted their movement as follows. Three trackers launched between October 15 and 16, 2016, some from the coast of Esmeraldas, Ecuador and others from the coast of the Ecuadorian and Colombian border. All three trackers converged when they traveled within the coastal region of Ecuador. Next, the trackers moved away from the coast of Ecuador, northwest towards the Galapagos Islands. The trackers then changed course and moved northeast towards the coast of the Guatemalan and El Salvadorian border. However, the GPS trackers suddenly stopped moving and then started drifting slowly in a south or southeast direction—indicating that the trackers were no longer on a vessel—in the area where the Coast Guard found them on October 24 and 25. The GPS trackers' trajectories were consistent with the Hamilton cutter's and helicopter's coordinate range data for the target GFV and the document containing coordinates found on the defendants' vessel. Four Coast Guard personnel testified that they

12

neither saw nor heard any other vessels in the vicinity during the entirety of the interdiction.

## F.    Defendants' Version of Events

The defendants told a different story.  According to Palacios-Solis's testimony at trial, he and his codefendants departed from the Esmeraldas, Ecuador, port for a short, four-day fishing trip on the boat.  Palacios-Solis testified that the boat, of which he was the captain, was a typical Ecuadorian fishing boat.  Palacios-Solis claimed that, while he initially lied to the Coast Guard about not being the captain, he admitted to his role once he arrived in Florida.  The defendants quickly returned to the Esmeraldas port because the boat's engines were not working well.  They had a mechanic fix the engine, but Palacios-Solis forgot to change the oil after the engine was fixed.

They again set out for their fishing trip.  On the second day of their fishing trip, once they were approximately 150 to 200 miles from the Esmeraldas, the engines failed and Palacios-Solis was not able to repair them.  They assumed that another fishing boat would come along and help them, but none did and they were left adrift for 27 to 30 days.

According to Palacios-Solis's testimony, he intentionally covered the engines to protect them from pirates.  The documents discovered during the search of the GFV were left by previous users and Palacios-Solis denied any knowledge

13

of their contents.  He testified that the lines on the vessel were for fishing and that they were rendered unusable by the Coast Guard personnel during their search.  He conceded that the buoy and black line found in the water looked just like the buoy and black line found on the vessel, which were his.  The brown packing tape on the vessel, however, was not his and Palacios-Solis denied knowing where it came from.  Palacios-Solis testified that the food was 30 days old and was not fresh and that there was not much food left over by the time the Coast Guard arrived.  The defendants were asleep when the Coast Guard approached their boat, they were confused by the lights and yelling, and they were scared that the Coast Guard personnel were going to kill them.

Throughout trial, the government's witnesses testified as to the coordinate locations of the critical points during the interdiction of the GFV and of the recovered cocaine bales.  In their case, however, the defendants called a maritime expert who created a model pointing out discrepancies in the government's plotted coordinates.  Nonetheless, on cross-examination, the maritime expert conceded that at least some portions of his method and model were erroneous, incomplete, and/or misleading.

Notably too, a Coast Guard maritime expert, who conducted a drift analysis, testified that the defendants' story about being adrift for about 30 days was physically impossible given the claimed starting point of the fishing trip, the

14

weather and currents, and the coordinate location of the interdiction. The Coast Guard expert disagreed with the accuracy of the defense expert's model. The Coast Guard expert testified that the southward location, where the Hamilton crew searched for and recovered the bales, was consistent with information regarding the direction of the GFV.

A Coast Guard health services technician also testified that she observed and examined the defendants once they were detained and brought aboard the Hamilton cutter on October 25. The health services technician testified the defendants did not require any medical intervention and exhibited no signs of malnourishment, dehydration, malnutrition, lethargy, or extended exposure to the elements.

## II. FIRST JURY TRIAL

On December 12, 2016, Palacios-Solis, Cabezas-Montano, and Guagua-Alarcon made their first entry into the United States, when they were brought to Key West, Florida, in the Southern District of Florida.

On December 13, a criminal complaint issued against the defendants and their initial appearances were held before a magistrate judge. The complaint charged all defendants with conspiracy to possess with intent to distribute five kilograms or more of cocaine on board a vessel subject to the jurisdiction of the United States. In an attached probable-cause affidavit, a Drug Enforcement Agency ("DEA") Special Agent stated how: (1) on October 25, the Coast Guard

detained the defendants and the GFV and then transferred the defendants to the Hamilton cutter, approximately 215 nautical miles off the coast of Guatemala/El Salvador; and (2) on December 12, the Coast Guard brought the defendants to Key West.

On December 16, the defendants were indicted on charges of: (1) conspiracy to possess with intent to distribute five or more kilograms of cocaine on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1), 70506(a) and (b), and 21 U.S.C. § 960(b)(1)(B) (Count 1); and (2) possession with intent to distribute five or more kilograms of cocaine on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(a), 21 U.S.C. § 960(b)(1)(B), and 18 U.S.C. § 2 (Count 2).

On February 4, 2017, the government filed a motion for the district court to make a pretrial determination of jurisdiction regarding whether the defendants' vessel was subject to the jurisdiction of the United States. The government submitted that: (1) the stateless GFV was interdicted in international waters and upon high seas by the Coast Guard on October 24, 2016; (2) at the time of the interdiction, there were three passengers on board, who were the defendants; (3) when asked by the Coast Guard, none of the defendants claimed to be the master of the vessel and none made a claim of nationality for it; and (4) thus, the

16

United States determined the vessel to be "without nationality" subjecting the vessel to the jurisdiction of the United States under 46 U.S.C. § 70502(c)(1)(A) and (d)(1)(B).

The first trial resulted in a mistrial after the jury was unable to reach a unanimous verdict. As outlined below, the district court explicitly addressed its jurisdiction before the second trial.

### III. SECOND JURY TRIAL

### A.    Defendants' Motion to Dismiss the Indictment

Prior to the second jury trial, all defendants moved to dismiss the indictment for lack of subject-matter jurisdiction on three enumerated grounds containing multiple sub-issues.[6] The defendants argued that: (1) there was no evidence that their vessel was outside the territorial waters of a foreign nation, precluding jurisdiction based on the vessel's status as one without nationality; (2) there was no evidence that the cocaine allegedly being transported by the vessel was destined for the United States, such that there was no U.S. "nexus" permitting the exercise of extraterritorial jurisdiction; (3)  without a requirement that the trafficking crime have a "nexus" to the United States, the MDLEA's jurisdictional element violates due process; (4) the MDLEA's requirement that the district court determine the

---

[6]While Palacios-Solis filed the motion to dismiss the indictment, the district court granted Cabezas-Montano's and Guagua-Alarcon's motion to adopt it.

17

jurisdictional element, rather than the jury, violates the Fifth and Sixth Amendment, especially in cases where a vessel is declared "stateless" and the parties dispute material facts regarding the alleged statelessness; and (5) the admission of a certification of the Secretary of State to establish extraterritorial jurisdiction in such a case would violate the Confrontation Clause and constitute inadmissible hearsay.

In response, the government argued, inter alia, that: (1) the defendants were interdicted in international waters and upon the high seas when their GFV was stopped approximately 215 nautical miles southwest of the coast of Guatemala in the Pacific Ocean; (2) their GFV was without nationality and was subject to the jurisdiction of the United States; and (3) the defendants' remaining arguments were foreclosed by this Court's precedent.

At a pre-trial hearing before a magistrate judge, defendants' counsel made their jurisdictional arguments. The magistrate judge's report ("R&R") recommended the denial of the defendants' motion to dismiss the indictment. The magistrate judge found that: (1) the vessel was in international waters at the time it was intercepted by the Coast Guard; (2) jurisdiction existed under § 70502(c)(1)(A) of the MDLEA because the defendants' vessel was "without nationality"; and (3) this Court's precedent foreclosed the defendants' constitutional arguments. Over the defendants' objections, the district court

18

adopted the R&R and denied their motion to dismiss the indictment.

## B.    Defendants' Post-Arrest, Pre-Miranda Silence

Next, Palacios-Solis filed a motion in limine to exclude evidence of the defendants' post-arrest, pre-Miranda silence in response to the Coast Guard's interrogation. Palacios-Solis conceded that this Court's precedent foreclosed his argument but sought to preserve the issue. Guagua-Alarcon adopted the motion.

In response, the government submitted that it did not intend to elicit, in its case-in-chief, the defendants' silence or statements other than their silence or answers to the Coast Guard's questions regarding: (1) the master or captain of the GFV; (2) the nationality of the GFV; (3) the last port of call; and (4) the next port of call. The government reserved the right to elicit any silence or statements during the defense's case and in rebuttal.[7]

The district court denied Palacios-Solis's and Guagua-Alarcon's motion in limine as moot. The district court highlighted: (1) the defendants' concession that this Court's precedent foreclosed their challenge; (2) the admissibility of their silence or answers to the questions identified by the government; (3) the government's indication that it otherwise would not elicit any other silence or statements by the defendants; and (4) the government's rights pertaining to cross-

---

[7]As explained later, the defendants on appeal challenge only the admission of their post-arrest, pre-Miranda silence.

examination during the defense's case and in rebuttal.

## C.    Pretrial Hearing

Before trial, the district court held a pretrial hearing during which it granted the defendants' motion to deem any objection made by one defendant as adopted by all defendants, unless a defendant opted out.  The government clarified that it intended to elicit during their case-in-chief: (1) the defendants' silence when asked about the GFV's nationality; (2) their actions of pointing to Cabezas-Montano and Palacios-Solis when asked about the vessel's master; (3) any statements or silence about the last and next ports of call; and (4) the defendants' statement that they were adrift at sea for about 30 days.  Palacios-Solis reiterated that this Court's precedent permitted the admission of such evidence, but that he preserved his challenge to it.

## D.    Government's Case-In-Chief

The second jury trial began on July 17, 2017.  The government called seven witnesses: (1) six Coast Guard members who carried out the October 24-through-25 interdiction operation and testified about the above events; and (2) the DEA forensic chemist who tested the seized evidence for cocaine.

When Petty Officer Robert Tetzlaff testified as to his observations from the CIC's FLIR system—namely, that he observed one of the GFV passengers flailing and frantically trying to fix the engine—Palacios-Solis moved for a mistrial on

20

Brady grounds.  Palacios-Solis asserted that Officer Tetzlaff's testimony indicated that there was a CIC FLIR video—showing the GFV passengers flailing and trying to restart the vessel—which the government had not turned over to the defense. The government responded that it learned of this aspect of Officer Tetzlaff's testimony only the day before trial, that it did not possess the CIC's FLIR video because it was already recorded over, and that it did not notify the defense because it did not view the evidence as exculpatory.

The district court agreed that the evidence was inculpatory, not exculpatory, but directed the government to investigate whether the FLIR video actually was recorded and/or recorded over.  The next day, the government notified the district court that, while the Coast Guard records its FLIR videos, it records over them if no preservation request is made, and that it no longer had the October 24/25, 2016 FLIR video.  Palacios-Solis renewed his mistrial motion, which Cabezas-Montano and Guagua-Alarcon joined.  The district court denied the motion and the trial continued.[8]

**E.    Defendants' Evidence, Government's Rebuttal, and Rule 29 Motions**

The government rested on the third day of trial.  The defendants moved for a

---

[8]On direct examination, Officer Tetzlaff testified that the October 24/25 FLIR video likely was recorded over.  During the defense's cross-examination, Officer Tetzlaff agreed that it would have been helpful to compare the CIC's and the helicopter's FLIR videos and testified further about his observations from the CIC's FLIR video on the night of the interdiction.  Then, on redirect examination, Officer Tetzlaff confirmed that he did not tell prosecutors about his CIC FLIR observations until just before the second trial.

judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. They argued that there was insufficient evidence of their guilt and the court lacked subject-matter jurisdiction.[9] The district court denied the defendants' Rule 29 motions.

The defense then called a maritime expert who prepared a coordinate model for this case. Palacios-Solis also testified. The defense rested. In rebuttal, the government called the Coast Guard health services technician and its own maritime expert who conducted a drift analysis of the defendants' vessel. The defendants renewed their Rule 29 motions, which the district court denied.

## F.    Jury Verdict and Post-Trial Motions

After deliberations, the jury found all three defendants guilty on both counts. Palacios-Solis filed a post-trial Rule 29 motion claiming again that: (1) there was insufficient evidence to support his convictions; (2) the court lacked subject-matter jurisdiction; and (3) the government's introduction of the defendants' post-arrest, pre-Miranda silence violated his Fifth Amendment rights against self-incrimination. Ultimately, at sentencing, the district court denied Palacios-Solis's post-trial Rule 29 motion. Among other things, the district court determined that no defendant had claimed to be the master of the vessel or claimed any nationality,

---

[9]Palacios-Solis renewed his motion to dismiss the indictment. Guagua-Alarcon adopted both codefendants' Rule 29 arguments. The district court stated that after trial it would revisit the renewed motion to dismiss but that it did not hear anything that would change its prior determination.

22

that the Coast Guard could not confirm or deny the vessel's nationality, and thus the vessel was without nationality and subject to the jurisdiction of the United States. This is the defendants' appeal.

## IV. MDLEA

Before addressing the defendants' appellate claims, we give some background about the MDLEA.

The Constitution empowers Congress "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. Art. I, § 8, cl. 10. "The Supreme Court has interpreted that Clause to contain three distinct grants of power: to define and punish piracies, to define and punish felonies committed on the high seas, and to define and punish offenses against the law of nations." United States v. Campbell, 743 F.3d 802, 805 (11th Cir. 2014). This MDLEA appeal involves a conviction for a felony offense defined by an act of Congress under the second grant of power. See id.

Congress enacted the MDLEA to prohibit any person from "knowingly or intentionally . . . possess[ing] with intent to manufacture or distribute, a controlled substance" on board "a vessel subject to the jurisdiction of the United States," 46 U.S.C. § 70503(a)(1) and (e)(1), and from conspiring to do the same, id. § 70506(b). Specifically, § 70503(a)(1) provides that, "[w]hile on board a covered vessel, an individual may not knowingly or intentionally . . . possess with intent to

23

manufacture or distribute, a controlled substance.  Id. § 70503(a)(1) (emphasis added).  The MDLEA defines a "covered vessel" to include, among other things, "a vessel subject to the jurisdiction of the United States."  Id. § 70503(e).  In turn, the MDLEA defines a "vessel subject to the jurisdiction of the United States" to include, among other things, "a vessel without nationality."  Id. § 70502(c)(1)(A).

In 1996, Congress amended the MDLEA to provide that "[j]urisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense."  Id. § 70504(a); see Campbell, 743 F.3d at 805.  That section continues that "[j]urisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge."  46 U.S.C. § 70504(a).  Congress made clear that the MDLEA "applies even though the act is committed outside the territorial jurisdiction of the United States."  Id. § 70503(b).

## V. DEFENDANTS' CONSTITUTIONAL CLAIMS

As a threshold matter, all defendants argue that the MDLEA is unconstitutional because: (1) Congress's power to define and punish felonies on the high seas is limited to felonies bearing a "nexus" to the United States; (2) due process prohibits the prosecution of foreign nationals for offenses bearing no "nexus" to the United States; and (3) the MDLEA violates the Fifth and Sixth

24

Amendments by removing the determination of jurisdictional facts from the jury.[10]

As the defendants concede, each of these constitutional arguments is foreclosed by our binding precedent. First, this Court has held that the MDLEA is a valid exercise of Congress's power under the Felonies Clause as applied to drug trafficking crimes without a "nexus" to the United States. See Campbell, 743 F.3d at 809-10; see also United States v. Valois, 915 F.3d 717, 722 (11th Cir.) (following Campbell and reaching the same holding), cert. denied, 140 S. Ct. 263 (2019); United States v. Cruickshank, 837 F.3d 1182, 1187-88 (11th Cir. 2016) (following Campbell and reaching the same holding); United States v. Estupinan, 453 F.3d 1336, 1338-39 (11th Cir. 2006).

Second, this Court has held that the Fifth Amendment's Due Process Clause does not prohibit the trial and conviction of aliens captured on the high seas while drug trafficking because the MDLEA provides clear notice that all nations prohibit and condemn drug trafficking aboard stateless vessels on the high seas. See United States v. Rendon, 354 F.3d 1320, 1326 (11th Cir. 2003); see also Valois, 915 F.3d at 722 (following Rendon and reaching the same holding). The defendants' MDLEA convictions thus do not violate their due process rights even if their offenses lack a "nexus" to the United States. See, e.g., United States v.

---

[10]We review de novo a district court's interpretation of a statute and whether a statute is constitutional. United States v. Valois, 915 F.3d 717, 722 n.1 (11th Cir.), cert. denied, 140 S. Ct. 263 (2019).

Wilchcombe, 838 F.3d 1179, 1186 (11th Cir. 2016); Campbell, 743 F.3d at 812.

Third, this Court has held that, because the MDLEA's jurisdictional requirement goes to the subject-matter jurisdiction of the courts and is not an essential element of the MDLEA substantive offense, it does not have to be submitted to the jury for proof beyond a reasonable doubt. See United States v. Tinoco, 304 F.3d 1088, 1109-12 (11th Cir. 2002); see also Valois, 915 F.3d at 722 (following Tinoco and reaching the same holding); Cruickshank, 837 F.3d at 1192 (following Tinoco and reaching the same holding); Campbell, 743 F.3d at 809 (following Tinoco and Rendon and reaching the same holding); Rendon, 354 F.3d at 1326-28 (following Tinoco and reaching the same holding).

The defendants also claim that: (1) the admission of a certification of the U.S. Secretary of State to establish extraterritorial jurisdiction, especially where a vessel is declared "stateless," violates the Confrontation Clause and constitutes inadmissible hearsay; and (2) the certification procedure as to the jurisdictional element violates the Due Process Clause of the Fifth Amendment by allowing an act of foreign omission to substitute for the government's burden of proof on a "material element." See 46 U.S.C. § 70502(d)(2) (providing that, when a master or individual in charge makes a claim of registry, the foreign nation may respond "by radio, telephone, or similar oral or electronic means," and the foreign nation's response "is proved conclusively by certification of the Secretary of State or the

26

Secretary's designee").  Ultimately, the government never introduced a certification from the Secretary of State, and thus we need not address these issues.

In any event, as the government points out, this Court has already held that the introduction of a Secretary of State certification to establish extraterritorial jurisdiction under the MDLEA does not violate the Confrontation Clause and does not constitute inadmissible hearsay.  See Campbell, 743 F.3d at 806-08 ("The Confrontation Clause does not bar the admission of hearsay to make a pretrial determination of jurisdiction when that hearsay does not pertain to an element of the offense."); Cruickshank, 837 F.3d at 1192 ("A United States Department of State certification of jurisdiction under the MDLEA does not implicate the Confrontation Clause because it does not affect the guilt or innocence of a defendant."); see also Valois, 915 F.3d at 722-23 (following Campbell and Cruickshank and reaching the same holding).   In Campbell, we determined that because the stateless nature of the defendant's vessel was not an element of his MDLEA offense to be proved at trial, the admission of the Secretary of State certification did not violate a defendant's right to confront the witnesses against him.  743 F.3d at 806.[11]

_____

[11]In his brief, Guagua-Alarcon argues that the MDLEA's certification procedure also violates separation of powers by unconstitutionally delegating the jurisdiction determination to the executive branch, as opposed to the judiciary or the jury.  Prior to the 1996 amendment to the MDLEA, this Court held that the MDLEA's certification procedure did not implicate separation of powers.  United States v. Rojas, 53 F.3d 1212, 1214-15 (11th Cir. 1995), superseded by statute as recognized in Campbell, 743 F.3d at 803-04.  We explained that the certification

Based on our binding precedent, we conclude that the defendants have not shown that the MDLEA is unconstitutional.[12]

## VI. MDLEA SUBJECT-MATTER JURISDICTION

Guagua-Alarcon and Palacios-Solis contend that, even if the MDLEA is constitutional, the district court erred in concluding that its statutory requirements for subject-matter jurisdiction were met.[13]  The government bears the burden of establishing that the statutory requirements of MDLEA subject-matter jurisdiction are met.  Tinoco, 304 F.3d at 1114.

---

procedure "merely provide[d] a method by which the Executive Branch [could] evidence that it ha[d] obtained a foreign nation's consent to jurisdiction," and that nothing in the procedure "deprive[d] the court of its ability and obligation to determine whether the requirements of the MDLEA ha[d] been met."  Id. at 1214-15 (explaining that the MDLEA left courts "free to determine, and [t]o decide, whether a proffered certificate [was] sufficient evidence of jurisdiction").

While we have not directly addressed in a published case whether the revised MDLEA statute's certification procedure implicates separation of powers, we have stated that "courts must still determine whether the MDLEA's jurisdictional requirements have been met," regardless of the MDLEA assigning conclusive proof to a certification provided by the Secretary of State or designee.  Wilchcombe, 838 F.3d at 1186-88; accord United States v. Mejia, 734 F. App'x 731, 734-35 (11th Cir.) (unpublished), cert. denied, 139 S. Ct. 593 (2018) (rejecting, in dicta, the defendant's separation of powers challenge under Rojas and Wilchcombe and concluding that "nothing in [§ 70502(d)(2)] deprives the district court of its power to determine whether the MDLEA's jurisdictional requirements have been met").  Ultimately, because the district court did not rely on a Secretary of State certification in finding that the defendants' vessel was subject to the jurisdiction of the United States, we need not rule on Guagua-Alarcon's separation of powers claim.

[12]In a letter notice of supplemental authority, Palacios-Solis argues that the MDLEA is void for vagueness.  Because Palacios-Solis failed to raise this issue at all in his brief, he has abandoned it.  See United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).

[13]We review de novo a district court's interpretation and application of statutory provisions regarding whether the district court has subject-matter jurisdiction.  Tinoco, 304 F.3d at 1114.  However, we review for clear error the district court's factual findings with respect to jurisdiction.  Id.

As noted above, a vessel is covered by the MDLEA if it is "subject to the jurisdiction of the United States."  46 U.S.C. § 70503(e)(1).  Here, the government asserted subject-matter jurisdiction under 46 U.S.C. § 70502(c)(1)(A): that the vessel was "subject to the jurisdiction of the United States" because it was "a vessel without nationality."  In § 70502(d)(1), the MDLEA defines "a vessel without nationality" as including each of the following three statutory options:

> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
>
> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
>
> (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

Id. § 70502(d)(1)(A)-(C).  From the outset, the government invoked jurisdiction over the defendants' vessel under § 70502(d)(1)(B), based on the defendants' failure to make a claim of nationality for the vessel.

Based on the record evidence, we conclude that the government established that the defendants' vessel was a "vessel without nationality" under the § 70502(d)(1)(B) definition and was thus subject to the jurisdiction of the United States under § 70502(c)(1)(A).  At trial, the Coast Guard boarding team members

29

testified that they asked the defendants to identify the master of the vessel and in response the defendants pointed at each other but no one identified himself as the master.

The LRI boarding team then also asked the defendants individually if anyone wished to make a claim of nationality for the vessel, but no one responded.[14] Despite being given two opportunities, the defendants did not produce any nationality documents, did not fly any nation's flags, and did not make any verbal claim of nationality or registry. Id. § 70502(e)(1)-(3).

We recognize that, on appeal, Guagua-Alarcon alleges that the defendants verbally claimed Ecuadorian nationality for the vessel, that the Ecuadorian government was unable to confirm the claim, and that, without a Secretary of State certification, the Coast Guard improperly assumed that the vessel was stateless, seized the defendants, and destroyed the vessel. The record evidence, however, does not show that any defendant claimed a nationality in response to the LRI boarding team's questions. Rather, the record shows that the LRI boarding team asked the defendants individually if anyone wished to make a claim of nationality for the vessel and the defendants did not respond. Because the defendants made no

---

[14]We recognize that the LRI boarding team did not also ask who was "the individual in charge," but the team's questions were nevertheless sufficient because they did ask all defendants if anyone wished to make a claim of nationality for the vessel. As such, any individual who possessed the authority to make a claim of registry or nationality for the vessel was given the opportunity to do so at the request of a duly authorized officer. See 46 U.S.C. § 70502(d)(1)(B).

30

claim of nationality, the statelessness of their vessel is clear under subsection (d)(1)(B), and a Secretary of State certification was unnecessary.  Id. § 70502(d)(1)(B), (d)(2).[15]

We do acknowledge that the Coast Guard learned that the vessel's last port of call was Ecuador, found the vessel's Ecuadorian maker's mark, and took an additional step beyond its statutory obligation when it contacted Ecuador to receive its statement of no objection.  This courtesy call, however, did not create a nationality claim on behalf of the defendants and their vessel where no master presented himself or actively made a claim of nationality.  See United States v. Obando, 891 F.3d 929, 933, 938 (11th Cir. 2018) (explaining that, because no crew member made a claim of nationality for their vessel, their vessel was "without nationality" under § 70502(d)(1)(B) even though the Coast Guard "out of an abundance of caution" did more than what was required by the MDLEA by contacting the Ecuadorian government when the vessel's master indicated that a painted flag on the vessel's hull was Ecuadorian); United States v. Hernandez, 864 F.3d 1292, 1304 (11th Cir. 2017) (recognizing that, once "the statutory requirements for MDLEA prosecution in U.S. courts have been met . . . any further

---

[15]Even so, the defendants' claim that the government must produce a certification when subject-matter jurisdiction is based on subsections (d)(1)(A) or (C) is unsupported by the language of subsection (d)(2).  While a certification provides conclusive proof of the foreign nation's response, the subsection does not state that the response cannot be proven by other means.  See 46 U.S.C. § 70502(d)(2).

31

jurisdictional complaint over that U.S. prosecution is to be handled by the executive branch, nation-to-nation, in the international arena"). Rather, the vessel remained stateless under § 70502(d)(1)(B).

It also is of no matter that the Coast Guard takes the last port of call as the nationality of the vessel and contacts that corresponding government when no claim is made. Whatever the foreign government's response (or non-response), the Coast Guard's taking of that additional step does not void a statelessness finding under §§ 70502(c)(1)(A) and 70502(d)(1)(B).

Consequently, the defendants' vessel was a "vessel without nationality," 46 U.S.C. § 70502(d)(1), and thus a "vessel subject to the jurisdiction of the United States," id. § 70502(c)(1)(A), and therefore a "covered vessel," id. § 70503(e)(1), to which the MDLEA's criminal prohibition against possessing a controlled substance with distributary intent extends, id. § 70503(a)(1). The district court properly exercised jurisdiction over the defendants and their offenses under the MDLEA.

## VII. DELAY IN GUAGUA-ALARCON'S PRESENTMENT

For the first time on appeal, Guagua-Alarcon argues that his convictions should be vacated because the government deliberately and tactically took seven weeks in order to transport him to Florida—rather than bringing him promptly before a magistrate judge in California, the closest U.S. state—for a probable cause

32

determination.[16]  He asserts that the government purposely delayed his presentment to a magistrate judge in order to forum shop because federal courts in California require the government to prove a U.S. "nexus" to establish subject-matter jurisdiction, whereas federal courts in Florida do not.

Nonetheless, Guagua-Alarcon concedes that we should review his delay challenge for plain error since he raises it for the first time on appeal.  Under the plain-error standard, we will vacate a judgment only if there is (1) an error, (2) that is plain, and the error both (3) affected the defendant's substantial rights, and (4) seriously affected the fairness of the judicial proceedings.  United States v. Ramirez-Flores, 743 F.3d 816, 822 (11th Cir. 2014); United States v. Hernandez, 906 F.3d 1367, 1370 (11th Cir. 2018).  A defendant cannot prevail on plain-error review "where there is no precedent from the Supreme Court or this Court directly resolving" the issue in favor of the defendant.  United States v. Lange, 862 F.3d 1290, 1296 (11th Cir. 2017) (quotation marks omitted).

As a preliminary matter, we note that the MDLEA does not prohibit the government from taking offenders to Florida rather than California.  A person violating the MDLEA "may be tried in any district," "if the offense was begun or committed upon the high seas," as was the case here.  46 U.S.C. § 70504(b)(2); see also 18 U.S.C. § 3238 (assigning jurisdiction over all offenses committed upon the

---

[16]Only Guagua-Alarcon makes this delay claim on appeal.

33

high seas to the district in which the offender is arrested or is first brought).

Accordingly, the issue here is not <u>where</u> the defendant was taken, but <u>why</u> it took

the government 49 days to present the defendant arrested outside the United States

before a magistrate judge in the United States for a probable cause hearing.

In this regard, Rule 5(a)(1)(B) of the Federal Rules of Criminal Procedure

expressly provides that "[a] person making an arrest outside the United States must

take the defendant <u>without unnecessary delay</u> before a magistrate judge, unless a

statute provides otherwise."  Fed. R. Crim. P. 5(a)(1)(B) (emphasis added).  In

<u>Mallory v. United States</u>, the Supreme Court indicated that the purpose of Rule

5(a) is to prevent oppressive police interrogations and other "third-degree" tactics

before bringing the accused in front of an officer of the court; the remedy was the

exclusion of evidence which was gained during the delay by the use of such tactics.

354 U.S. 449, 451-54, 77 S. Ct. 1356, 1357-59 (1957); <u>see</u> <u>McNabb v. United</u>

<u>States</u>, 318 U.S. 332, 345, 63 S. Ct. 608, 615 (1943) ("[T]o permit such evidence to

be made the basis of a conviction in the federal courts would stultify the policy

which Congress has enacted into law.");[17] <u>United States v. Mendoza</u>, 473 F.2d 697,

---

[17]The <u>McNabb-Mallory</u> exclusionary rule—under which an arrestee's confession, whether voluntary or involuntary, is inadmissible if given after an unreasonable delay in bringing him before a judge—was superseded in part by 18 U.S.C. § 3501, which immunizes voluntary confessions given within six hours of a suspect's arrest. <u>See</u> <u>Corley v. United States</u>, 556 U.S. 303, 306-11, 322, 129 S. Ct. 1558, 1562-64, 1571 (2009).  The Supreme Court in <u>Corley</u> held that Congress intended merely to modify <u>McNabb-Mallory</u>'s exclusionary rule, rather than supplant it, when it enacted § 3501. <u>Id.</u> at 306, 322, 129 S. Ct. at 1562, 1571.

702 (5th Cir. 1973) ("A violation of [Rule 5(a)] renders the evidence obtained <u>per se</u> inadmissible.").[18]

In <u>United States v. Purvis</u>, this Court expressly addressed "unnecessary delay" under Rule 5(a)(1)(B).  768 F.2d 1237, 1238-39 (11th Cir. 1985).  This Court held that various factors are considered in determining whether a delay was unnecessary, including: (1) the distance between the location of the defendant's arrest in international waters and the U.S. port he was brought to; (2) the time between the defendant's arrival at the U.S. port and his presentment to the magistrate judge; (3) any evidence of mistreatment or improper interrogation during the delay; and (4) any reason for the delay, like exigent circumstances or emergencies.  <u>Id.</u>

Here, the timeline and location of defendant Guagua-Alarcon's arrest are not disputed.  Guagua-Alarcon was brought onboard the <u>Hamilton</u> cutter on October 25, and the cutter was located 200-plus miles off the coast of Guatemala/El Salvador.  On December 12, Guagua-Alarcon made his first entry into the Key West port.  On December 13, he was presented for his initial appearance before a magistrate judge.  There was a 49-day delay between Guagua-Alarcon's arrest and his presentment.

---

[18]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.  <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

As to the first Purvis factor, the distance between the arrest location outside the United States and Key West was quite lengthy. As to the second Purvis factor, Guagua-Alarcon arrived at Key West on December 12 and was presented immediately to the magistrate judge on December 13. As to the third Purvis factor, there is no claim that Guagua-Alarcon was mistreated or improperly interrogated during transit. Thus, the first, second, and third Purvis factors arguably help the government.

As to the fourth Purvis factor, the problem for Guagua-Alarcon is that he did not raise this delay issue below, much less claim the delay was "unnecessary," and thus he has presented no evidence (at trial or a pre-trial hearing) indicating the reasons or circumstances behind the delay. Guagua-Alarcon's allegation that the government deliberately and tactically delayed in order to forum shop is pure speculation and unsupported by any record evidence.[19] By failing to develop the factual predicates for his claim in the district court, Guagua-Alarcon has failed to carry his burden to show the particular delay here was "unnecessary" and thus a Rule 5(a) violation.[20]

---

[19]Guagua-Alarcon argues that California was closer to the location of his arrest than Florida. There is no record evidence regarding the distances between Guagua-Alarcon's arrest and those U.S. states. Because of the Panama Canal route, geographical calculations are needed to reveal the distances.

[20]The government (without evidence too) asserts that the delay could have been caused by any number of valid reasons, such as the Coast Guard opting to continue their normal law enforcement patrolling activities through the conclusion of their mission, "diplomatic wrangling"

Given this problem, Guagua-Alarcon argues that we should remand for an evidentiary hearing, but such further hearing and fact finding at this point in the proceedings would undermine the plain-error doctrine.  See United States v. Bonavia, 927 F.2d 565, 570 (11th Cir. 1991) ("We note that the plain error doctrine should be applied sparingly lest the contemporaneous objection rule, requiring timely objections to preserve issues for appeal, be swallowed by the plain error exception.").

In any event, Guagua-Alarcon points to no controlling precedent from the Supreme Court or the Eleventh Circuit establishing that a 49-day delay, no matter the circumstances of this interdiction on the high seas 200 miles off the coast of Guatemala/El Salvador, presumptively constitutes "unnecessary delay" under Rule 5(a).  In other MDLEA cases, this Court has concluded that delays, albeit shorter ones, were reasonable.  See Purvis, 768 F.2d at 1239 (holding that a five-day delay was reasonable for defendants arrested on the high seas approximately 350 miles from Key West); United States v. Odom, 526 F.2d 339, 342-43 (5th Cir. 1976) (holding that a five-day delay was reasonable for a defendant arrested on the high

---

between the U.S. and Ecuadorian governments, a mechanical mishap, or some other emergency. In short, both Guagua-Alarcon and the government speculate as to the cause of the delay.

However, on appeal, Guagua-Alarcon has moved to vacate his convictions based on "unnecessary delay" under Rule 5(a), and thus he as movant has the burden to establish the delay was "unnecessary."  Yet, he has not developed the required factual predicate to do so.  To be clear, our ruling is based on the lack of evidence or factual predicate for the "unnecessary delay" claim, not on the merits of the claim.

37

seas approximately 200 miles from the United States); see also United States v. Castillo, 899 F.3d 1208, 1217-18 (11th Cir. 2018) (Martin, J., concurring) (discussing Rule 5(a)(1)(B) and determining that a 19-day delay was reasonable for a defendant arrested off of "[t]he Pacific coast of Guatemala," "approximately 1,000 miles from the port of Miami"), cert. denied, 139 S. Ct. 796 (2019).[21]  No case, however, has addressed a 49-day delay or held what circumstances or reasons would make such a delay unnecessary.  Because no Supreme Court or Eleventh Circuit precedent has ruled whether a delay in presentment similar to Guagua-Alarcon's was "unnecessary delay" under Rule 5(a), Guagua-Alarcon has failed to show plain error.

Despite Rule 5(a), Guagua-Alarcon asserts that his case is controlled by the constitutional, 48-hour rule established by the Supreme Court in County of Riverside v. McLaughlin, 500 U.S. 44, 111 S. Ct. 1661 (1991).  Prior to McLaughlin, the Supreme Court held that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention." Gerstein v. Pugh, 420 U.S. 103, 126, 95 S. Ct. 854, 869 (1975).  Then, in McLaughlin, the Supreme Court ruled that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter,

---

[21]The majority in Castillo held that the defendant's guilty plea waived his right to challenge his detention and did not address the Rule 5(a) issue.  899 F.3d at 1214-15.

38

comply with the promptness requirements of Gerstein." McLaughlin, 500 U.S. at 56, 111 S. Ct. at 1670.

Guagua-Alarcon contends McLaughlin established a per se 48-hour outer-limit rule and thus his detention violated the Fourth Amendment. However, McLaughlin did not establish 48 hours as a per se outer limit. See id. at 56, 111 S. Ct. at 1670 ("[W]e hesitate to announce that the Constitution compels a specific time limit."). Rather, in McLaughlin, the Supreme Court held that, generally, when a probable cause determination does not happen within 48 hours, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." Id. at 47, 56, 111 S. Ct. at 1665, 1670; Powell v. Nevada, 511 U.S. 79, 83-84, 114 S. Ct. 1280, 1283 (1994). Again, because Guagua-Alarcon did not raise his McLaughlin claim in the district court, we must review his McLaughlin claim too for plain error.

Here, Guagua-Alarcon has not shown error, much less plain error, because the Fourth Amendment does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien arrested in international waters or a foreign country. See United States v. Verdugo-Urquidez, 494 U.S. 259, 274-75, 110 S. Ct. 1056, 1066 (1990) (holding that the Fourth Amendment protects only "the people" of the United States and has no application to search-and-seizure challenges where the challenger is a non-citizen/non-resident alien with no

39

voluntary attachment to the United States and the area searched is located outside of the United States);[22] United States v. Vilches-Navarrete, 523 F.3d 1, 13 (1st Cir. 2008) (applying Verdugo-Urquidez and holding the district court properly dismissed the MDLEA defendant's Fourth Amendment claim regarding the U.S. Coast Guard's actions because the defendant was Chilean, he was not residing in the United States, and the Coast Guard's actions occurred in international waters); United States v. Bravo, 489 F.3d 1, 8-9 (1st Cir. 2007) (holding the district court properly denied the MDLEA defendants' motion to suppress evidence seized from their vessel because, under Verdugo-Urquidez, "the Fourth Amendment does not apply to activities of the United States against aliens in international waters"); United States v. Zakharov, 468 F.3d 1171, 1179-80 (9th Cir. 2006) (holding that, because the alleged unconstitutional delay took place outside of the United States in international waters and there was no suggestion that Zakharov, as neither a U.S. citizen nor U.S. resident, had any substantial connection to this country, the Fourth Amendment did not apply to him and his claim); see also United States v. Rojas, 812 F.3d 382, 388, 397-98 (5th Cir. 2016) (holding that, under Verdugo-Urquidez, the defendants—Colombian citizens and residents—had no Fourth Amendment

---

[22]The Supreme Court explained in Verdugo-Urquidez that, "[t]here is likewise no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters." 494 U.S. at 267, 110 S. Ct. at 1061. Rather, "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." Id. at 271, 110 S. Ct. at 1064.

protections to challenge the admission of wiretap conversations, which were recorded in Colombia, in their drug trafficking prosecutions under 21 U.S.C. §§ 959, 960, and 963).

While not in a drug trafficking case under the MDLEA, this Court similarly has applied the Verdugo-Urquidez rule in drug trafficking cases brought against non-resident aliens.  See, e.g., United States v. Valencia-Trujillo, 573 F.3d 1171, 1173, 1182-83 (11th Cir. 2009) (holding that, under Verdugo-Urquidez, "[t]he Fourth Amendment . . . does not apply to actions against foreign citizens on foreign soil" and thus a non-resident alien charged with drug smuggling crimes could not challenge on Fourth Amendment grounds the district court's denial of an evidentiary hearing in which he sought to invalidate his arrest and involuntary extradition in Colombia);[23] United States v. Emmanuel, 565 F.3d 1324, 1332 (11th Cir. 2009) (holding, in a drug trafficking case, that "[t]he Fourth Amendment exclusionary rule does not apply to the interception of wire communications in the Bahamas of a Bahamian resident").

In this drug trafficking case under the MDLEA, we too must follow Verdugo-Urquidez and conclude that defendant Guagua-Alarcon, who is a non-U.S. citizen and non-U.S. resident, and who has no significant connection to the

---

[23]In Valencia-Trujillo, this Court added that "[t]he allegedly improper seizure of Valencia-Trujillo occurred in Colombia," and "[b]ecause there can be no violation of our Fourth Amendment in that country, there can be no entitlement to a Franks hearing to establish that one occurred there." Id. at 1183.

41

United States, cannot challenge under the Fourth Amendment and <u>McLaughlin</u> the Coast Guard's conduct in taking 49 days on the high seas outside of the United States to transport him to Florida for presentment to the magistrate judge.[24] Rather, the correct analytical framework for Guagua-Alarcon's delay-in-presentment challenge is under Rule 5(a) and the <u>Purvis</u> factors as outlined above. Thus, Guagua-Alarcon has shown no plain error to establish his Fourth Amendment and <u>McLaughlin</u> claims.[25]

## VIII. DEFENDANTS' POST-ARREST, PRE-<u>MIRANDA</u> SILENCE

Palacios-Solis argues that the district court erred in denying his motion in limine to preclude the government from presenting evidence of the defendants' post-arrest, pre-<u>Miranda</u> silence as "consciousness of guilt."[26]

As Palacios-Solis concedes, this Court's binding precedent forecloses his

---

[24]Once Guagua-Alarcon was brought to Florida on December 12, he appeared before a magistrate judge on December 13.  The issue here is only about the Coast Guard's conduct in taking 49 days to transport Guagua-Alarcon to Florida (or, as Guagua-Alarcon alleges, deliberately delaying his transit).

[25]In his initial brief, Guagua-Alarcon stated that his remedy for the unreasonable delay in presentment was to vacate his convictions.  While we need not, and do not, reach this issue, we note that federal courts have concluded that the remedy for a <u>McLaughlin</u> or Rule 5(a) delay-in-presentment violation is suppression of the evidence obtained during the delay, not the vacatur of a conviction.  See <u>Corley</u>, 556 U.S. at 309, 129 S. Ct. at 1563 (explaining that, generally, confessions made during periods of detention that violate the prompt presentment requirement of Rule 5(a) are rendered inadmissible); <u>Gerstein</u>, 420 U.S. at 119, 95 S. Ct. at 865 (explaining the "established rule that illegal arrest or detention does not void a subsequent conviction" and that "a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause"); <u>Mendoza</u>, 473 F.2d at 702.

[26]We review evidentiary rulings for an abuse of discretion.  <u>United States v. Turner</u>, 474 F.3d 1265, 1275 (11th Cir. 2007).

argument.  Once a defendant is in custody and receives <u>Miranda</u> warnings, he indisputably has a Fifth Amendment right to remain silent.  <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 304-05, 311, 105 S. Ct. 1285, 1290-91, 1294 (1985).  Yet, the Supreme Court has expressly held that the Fifth Amendment allows the use of a defendant's post-arrest, pre-<u>Miranda</u> silence to impeach the defendant.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 628, 113 S. Ct. 1710, 1716 (1993).  This Court, in <u>United States v. Rivera</u>, went one step further.  944 F.2d 1563, 1568 (11th Cir. 1991).  In <u>Rivera</u>, this Court held that, in its case-in-chief, the government may use a defendant's post-arrest, pre-<u>Miranda</u> silence as direct evidence tending to prove the defendant's guilt.  <u>Id.</u>

Palacios-Solis points out a circuit split on this issue.  This Court has already noted this circuit split in <u>Wilchcombe</u> and again upheld our precedent in <u>Rivera</u>. <u>Wilchcombe</u>, 838 F.3d at 1190-91 ("Whatever the state of the law in other circuits, in our circuit it was permissible for the government to comment on [the defendant's] silence.").  Given our precedent, the district court did not abuse its discretion in denying Palacios-Solis's motion in limine on this basis.

## IX. SUFFICIENCY OF THE EVIDENCE

As to both counts, Cabezas-Montano and Palacio-Solis argue that there was insufficient evidence to convict them of violating the MDLEA because the government offered no evidence that they were the ones responsible for the drugs

43

the Coast Guard found floating in the Pacific Ocean two-and-a-half hours after the helicopter initially spotted the target GFV's passengers jettisoning packages.[27]

To prove the existence of a conspiracy, "the government must establish that an agreement existed between two or more persons and that the defendant knowingly and voluntarily participated in it." Tinoco, 304 F.3d at 1122 (quotation marks omitted) (reviewing the sufficiency of the evidence supporting conspiracy and substantive MDLEA convictions). The government may meet its burden using circumstantial evidence. Id. While a defendant's presence is not determinative, it is a material factor when weighing evidence of a conspiracy. Id. at 1122-23.

The government also may use circumstantial evidence to meet its burden of proving possession of a controlled substance with intent to distribute. Id. A defendant's possession may be either actual or constructive. Id. A defendant constructively possesses contraband when he exercises some measure of dominion or control over it, either exclusively or in association with others. Id. Moreover, we may infer a defendant's intent to distribute from the large quantity of narcotics seized. Id.

---

[27]We review de novo whether the record contains sufficient evidence to support the jury's guilty verdict, viewing the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility evaluations in favor of the verdict. Tinoco, 304 F.3d at 1122. We will not overturn the jury's verdict "unless no trier of fact could have found guilt beyond a reasonable doubt." Id. (quotation marks omitted). The evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." Id. (quotation marks omitted).

44

As this Court has pointed out, "conspiracy and possession cases involving narcotics-laden vessels present repetitive fact patterns." Id. In Tinoco, we identified these factors to consider when determining whether a jury reasonably could conclude that a defendant found on the target vessel was guilty of the drug conspiracy and possession charges:

> (1) probable length of the voyage, (2) the size of the contraband shipment, (3) the necessarily close relationship between captain and crew, (4) the obviousness of the contraband, and (5) other factors, such as suspicious behavior or diversionary maneuvers before apprehension, attempts to flee, inculpatory statements made after apprehension, witnessed participation of the crew, and the absence of supplies or equipment necessary to the vessel's intended use.

Id. Once the government shows that a large quantity of contraband was present on a vessel, its "remaining burden of showing that the crew knowingly participated in the drug trafficking operation is 'relatively light,'" and can be met by proving any one of the other Tinoco factors. Id.

In this case, the jury had ample evidence demonstrating that the defendants were guilty of the MDLEA conspiracy and possession crimes. First, the evidence showed that the defendants' vessel was the same GFV the Coast Guard was targeting on the night of October 24. Multiple units of the Hamilton cutter monitored and chased the target GFV for almost three hours, stayed in contact with each other and shared coordinate locations throughout this time period, and only lost its visual of the GFV for 31 minutes. The target GFV was a 30-to-35-foot

45

high-speed vessel with two outboard engines carrying three passengers, and the three defendants and their vessel matched that description. The Hamilton crew found the defendants' vessel in the vicinity it had been searching for and chasing the GFV. And, importantly, the Hamilton crew neither saw nor heard of any other vessels in the vicinity during the entirety of the interdiction.

Additionally, the results of the Coast Guard's searches of the defendants' vessel and the GPS trackers matched their observations during the chase of the GFV. The FLIR video showed that the GFV's left side engine was emitting less heat than the right side engine, which was consistent with the LRI boarding team's discovery of a wet shirt covering the left engine. The buoys and black line recovered from the water matched those discovered on the defendants' vessel and claimed by Palacios-Solis. And the trajectories of the GPS trackers on the recovered bales were consistent with the Hamilton cutter's and helicopter's coordinate range data for the target GFV as well as the coordinate document found on the defendants' vessel.

Moreover, the defendants' story that they had gone on a four-day fishing trip but had been lost or adrift at sea for about 30 days was contradicted by substantial evidence: (1) the defendants' vessel was a GFV and not a fishing boat; (2) the GFV's bottom side was clean and had no growth; (3) the defendants had no bait, fish, or useable fishing lines onboard; (4) they had a substantial amount of fuel for

46

a short fishing trip; (5) they had large quantities of food and liquids, which appeared to be fresh; (6) they did not seem happy to see the Coast Guard after being adrift for about 30 days; (7) they needed no medical care and showed no signs of lethargy, extended exposure to the elements, or malnutrition; and (8) a drift analysis showed that their story was impossible based on their claimed starting point, the weather and currents, and the coordinate location of the interdiction.

In short, while the Hamilton crew lost a visual of the GFV for 31 minutes, there was a wealth of other evidence establishing that the defendants' later-captured vessel was the observed target GFV which was jettisoning the bales of cocaine.

Second, the evidence also showed that the recovered bales of cocaine were the same ones that were jettisoned by the target GFV, which was the defendants' vessel. While aboard the target GFV, the defendants jettisoned numerous packages overboard during the chase and then the helicopter crew communicated the location of the jettisoned packages by using chemical lights and relaying the coordinate position. Although the OTH crew did not find the jettisoned packages at the specified location, the OTH crew recovered one package of cocaine and a buoy with a black line floating in the water while en route to the location where the defendants' vessel had been visually reacquired. Then, the OTH crew recovered

47

24 more bales of cocaine and buoys equipped with GPS trackers after conducting a drift analysis to calculate the likely location of the jettisoned packages given the current and wind movement.  And, according to the Coast Guard maritime expert's testimony, the southward location where the Hamilton crew searched for and recovered the bales was consistent with information regarding the direction of the GFV.

Once again, the results of the vessel and GPS-tracker searches matched the Hamilton crew's observations during the chase of the GFV.  The buoys, black line, and brown packing tape wrapped around the cocaine bales matched those discovered on the defendants' vessel.  The GPS trackers' trajectories on the recovered bales were consistent with the coordinate range data for the GFV, the coordinate document found on the defendants' vessel, and Palacios-Solis's statement to the LRI boarding team that the defendants' last port of call was in Ecuador.  The GPS trackers also showed the sudden stopping and slow drifting of the bales, which is consistent with the defendants jettisoning the bales off the GFV and the bales drifting in the water into the area where the Coast Guard eventually found them.

Still yet, other evidence established the link between the defendants and the recovered bales of drugs.  By the time the LRI boarding team boarded the defendants' vessel, it had been wiped down almost entirely with fuel, so as to hide

48

any remaining evidence of drugs. The defendants appeared visibly concerned when the LRI boarding team began the swabbing process, which revealed that one of the defendants and the GFV's bow and tiller recently were in contact with trace amounts of cocaine. And, as discussed earlier, the defendants' fishing story was contradicted by substantial evidence.

Although the Hamilton crew discovered the bales of cocaine in areas outside of the immediate location where they reacquired sight of the GFV and where they dropped chemical lights, there was plenty of other evidence establishing that these were the packages that the defendants jettisoned off their vessel. In sum, sufficient evidence established that the defendants' vessel was the target GFV and that the recovered cocaine bales were the ones that had been jettisoned from the GFV.

With that established, we now turn to the Tinoco factors and why a jury could reasonably find the defendants were involved in a conspiracy to traffic and possess the drugs on their vessel. The size of the contraband shipment is relevant to show: (1) the passengers' knowledge of the contraband's presence on the vessel; (2) the passengers' intent to use the contraband for large-scale distribution, rather than for personal use; and (3) participation in the drug trafficking conspiracy by all the vessel's passengers. See Tinoco, 304 F.3d at 1121, 1123 ("The value of the cocaine also was relevant to showing that the cocaine most likely was not for personal consumption, but for large-scale distribution, which went to whether the

49

appellants acted with an intent to distribute the cocaine."); United States v. Cruz-Valdez, 773 F.2d 1541, 1546 (11th Cir. 1985) (explaining that large drug quantities on a small vessel "make it most unlikely that the persons on board will be ignorant of its presence" and that "it is highly improbable that drug smugglers would allow an outsider on board a vessel filled with millions of dollars worth of contraband").

Indeed, the packages jettisoned from the defendants' vessel contained a large amount of cocaine—25 total bales of cocaine collectively weighing 614 kilograms and worth $10 million wholesale. See United States v. Hernandez, 864 F.3d 1292, 1304-05 (11th Cir. 2017) (stating that 290 kilograms of cocaine within ten previously jettisoned bales indicated cocaine smuggling). Although the defendants' vessel was carrying a large cocaine shipment, only three crew members were aboard. See Tinoco, 304 F.3d at 1123 ("The presence of a large amount of contraband on a small vessel with a small crew evidenced the defendants' knowing participation in the drug smuggling operation."). And, at trial, Palacios-Solis testified and eventually admitted that he was the captain aboard a small 30-to-35-foot vessel for possibly up to ten days, given the GPS tracker evidence. Given the small size of the boat, the few number of crew members, and the large amount of cocaine, that evidence made it reasonable for the jury to find beyond a reasonable doubt that the defendants knew of and agreed to participate in the charged drug conspiracy and possession crimes.

50

Yet, the government also proved three other Tinoco factors indicative of guilt of the charged crimes: (1) suspicious behavior or diversionary maneuvers before apprehension; (2) attempts to flee; and (3) absence of equipment necessary to the vessel's purported use as a fishing boat. The evidence established that the defendants led the Hamilton crew on a two-hour chase, despite the crew's repeated orders and warning shots to signal the vessel to heave to. The defendants covered at least one of their engines to reduce its visibility, restarted their engines and began moving each time the Coast Guard reacquired them, and engaged in evasive, zig-zag movements. The defendants also wiped down their vessel with fuel before the boarding crew came aboard. And, other than some fishing hooks and knives, there were no usable fishing supplies or equipment aboard.

Ultimately, a jury reasonably could conclude that the defendants were guilty of the drug conspiracy and possession charges given their presence and close proximity on the small GFV for several days, the large amount and high monetary value of the cocaine, their diversionary maneuvers and attempts to flee, and the absence of necessary fishing supplies on their vessel. Id. at 1122-23. We thus conclude sufficient evidence supported the defendants' convictions.[28]

## X. PALACIOS-SOLIS'S MOTION FOR A MISTRIAL

---

[28]We recognize that the government stresses that the defendants did not verbally respond when asked the right-of-visit questions and pointed at each other when asked to identify the master of the vessel. However, we need not rely on that evidence to uphold the jury's verdict here.

51

Palacios-Solis argues that the district court abused its discretion in denying his motion for a mistrial based on the government's alleged Brady violation for not disclosing the CIC's FLIR video on the Hamilton cutter and the fact that Petty Officer Tetzlaff observed critical events as recorded by that video.[29]  Palacios-Solis takes issue with Officer Tetzlaff's testimony that he observed on the video that one of the defendants "looked . . . very frantic trying to get the engine fixed."

Palacios-Solis has not shown that the prosecution's failure to disclose this evidence violated his rights under Brady.  The Supreme Court in Brady held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87, 83 S. Ct. at 1196-97 (emphasis added).  Here, Palacios-Solis has not shown that the subject evidence was "favorable" or exculpatory, but concedes that Officer Tetzlaff's testimony about the contents of the CIC's FLIR video was "highly-incriminating" and "contradicted" the defendants' innocent version of events.  Palacios-Solis made the same concession when arguing his motion for a mistrial before the district court.  Because the purportedly suppressed evidence is neither favorable nor material, Palacios-Solis failed to show a Brady violation and

---

[29]"We review for abuse of discretion the denial of a motion for a mistrial."  Valois, 915 F.3d at 723 n.2.

52

the district court did not abuse its discretion in denying his motion for a mistrial.

## XI. SENTENCING

### A.    Defendants' Presentence Investigation Reports ("PSR")

Cabezas-Montano's and Guagua-Alarcon's PSRs assigned them a base offense level of 38 for Counts 1 and 2, under U.S.S.G. § 2D1.1(a)(5) and (c)(1), because they were responsible for transporting 614 kilograms of cocaine.[30]  The PSRs did not apply either an aggravating or mitigating role adjustment.  Their total offense level of 38 and criminal history category of I yielded an advisory guidelines range of 235 to 293 months' imprisonment for both counts.

Palacios-Solis's PSR assigned him a base offense level of 38 for Counts 1 and 2, under § 2D1.1(a)(5) and (c)(1), because he too was responsible for transporting 614 kilograms of cocaine.[31]  The PSR added a two-level increase for his role as the captain of the vessel and a two-level increase for obstruction of justice by giving false trial testimony about being adrift for about 30 days.  The PSR pointed out that Palacios-Solis admitted at trial to being the captain of the vessel.  Palacios-Solis's total offense level of 42 and criminal history category of I yielded an advisory guidelines range of 360 months' to life imprisonment for both

---

[30]The base-offense-level paragraph in Guagua-Alarcon's PSR actually states that he was held accountable for "612 kilograms" of cocaine, but this appears to be a typo, as the quantity of cocaine is otherwise documented as "614 kilograms" elsewhere in his PSR.

[31]The base-offense-level paragraph of Palacios-Solis's PSR includes the same "612 kilogram" typo as in Guagua-Alarcon's PSR.

53

counts.

## B.    Defendants' Objections and Motions for Downward Variance

All defendants filed written objections to their PSRs and then made or expanded upon their objections at the sentencing hearing.  All defendants objected to not receiving a two-level minor-role reduction under U.S.S.G. § 3B1.2(b). Palacios-Solis also objected: (1) to the PSR's factual basis, maintaining his innocence; (2) to his two-level aggravating role increase under U.S.S.G. § 2D1.1(b)(3)(C); (3) to his not receiving a two-level reduction under the "safety valve" provision of U.S.S.G. § 5C1.2; and (4) to his receiving the two-level increase for obstruction of justice.

All defendants also moved for downward variances pursuant to 18 U.S.C. § 3553(a), requesting the 120-month statutory mandatory minimum sentence. Guagua-Alarcon highlighted his poverty, poor education, physical disabilities, familial relationships in Ecuador, efforts to support his family, and minor role in the offense.  Cabezas-Montano emphasized his age, lack of prior crimes, minor role in the offense, familial relationships in Colombia, and efforts to support his family.  Palacios-Solis stressed his "background and characteristics" and the severity of a 360-month sentence.  Each defendant made only $80 to $100 a week, lived in poverty, was poorly educated, and had family members in their home countries who depended upon them financially.

## C.    Government's Response

In response, the government argued that none of the defendants should receive a minor-role reduction because: (1) they were held accountable only for the quantity of cocaine they jettisoned from their vessel; (2) they jettisoned a huge quantity of cocaine; (3) they each played a vital role in the drug trafficking conspiracy and in attempting to destroy the evidence of their crimes; and (4) their transportation of such a large cocaine shipment was an essential component of their drug trafficking.  The government emphasized that Palacios-Solis's role increase applied given his admission that he was the captain.  The government stressed that Palacios-Solis was not eligible for the safety-valve relief because he had not provided the government with any information about his offenses and there was no precedent supporting his Fifth Amendment challenge to that requirement for safety-valve relief.  And his false trial testimony warranted his obstruction-of-justice increase.

## D.    Sentencing Hearing

The defendants were sentenced together at a combined hearing.  The district court addressed the defendants' arguments as to their alleged minor roles, which largely overlapped with their arguments for downward variances.  Cabezas-Montano and his counsel led these arguments, which were adopted and briefly

55

expanded upon by Palacios-Solis's and Guagua-Alarcon's attorneys.

The defendants argued that they were the "little guys" in the drug trafficking operation, as they did not own the drugs, package the drugs, make arrangements for the drugs' transportation or receipt, or make "millions and millions" of dollars off of the drugs' distribution.  For example, Cabezas-Montano, as a "little guy," lived in poverty in his home country, only made up to a hundred dollars a week as a career fisherman, and stood to make more money in one week than he'd make in 20 years if he succeeded in this drug trafficking trip.  While the defendants were not minor participants with respect to the transported drugs in this case, they were "very small fish in a very large [drug trafficking] pond" with respect to "the real world."  While the "little fish" risked long sentences if they got caught, the "big guys" would continue to run the operation and make millions.  The defendants also had no decision-making authority within the conspiracy.  The defendants did not plan or organize the drug operation but only transported the drugs.  They pointed out that the Guidelines reference transporting drugs as an example of conduct that could be eligible for a minor-role reduction.[32]

The government reiterated that the defendants were not entitled to a minor-role reduction because they were entrusted with a large quantity of cocaine, they

---

[32]This is a compilation of the defendants' arguments in their written objections and at sentencing.

evaded the Coast Guard and created a substantial risk to those involved in the interdiction efforts, and they acted together in navigating the vessel and throwing the cocaine overboard.

The district court then engaged in a lengthy colloquy with Cabezas-Montano's counsel regarding his argument that the defendants were just the "little guys" in a larger operation. The district court asked how it would know whether a defendant aboard a vessel was a "little guy" or was a "big guy" representing the owners of the cocaine. Cabezas-Montano stated that those facts would be based on the government's intelligence on particular trafficking organizations or networks, investigation into the particular case, or cooperation of the defendants. Cabezas-Montano argued that the government presented no evidence indicating he was anything other than what he said: a low-income fisherman.

The district court also inquired about deterrence and asked about how much couriers typically make for successfully transporting cocaine. Cabezas-Montano stated that a typical courier could make $20,000 for transporting a load of cocaine, which was a lot more than he made per week back at home. The district court was concerned that an individual like Cabezas-Montano would not be deterred from attempting a successful run given the possible reward. Cabezas-Montano responded that he already was deterred by the remorse of being separated from his family and the guilt of no longer being able to provide for them. He argued that

57

many people in his home country do not realize the risk they face by transporting drugs and that general deterrence would be better served if he were able to return home and relay what happened to him. Cabezas-Montano reiterated that 120 months was very severe and would be sufficient to deter him.

Ultimately, the district court was unpersuaded by the defendants' deterrence argument given the number of individuals who make similar trips, some of which are successful and report their successes to their villages. The district court indicated that MDLEA penalties were significant partly because of the harm these drug offenses wreak on our society. The district court concluded: (1) that transportation was a critical role in the drug trafficking industry; (2) that defendants are accountable for their role in the conspiracy that was charged, not in a larger conspiracy that involved drug manufacturers or distributors somewhere else; and (3) that each of the defendants was an essential member of this conspiracy. The district court overruled the defendants' minor-role objections. After hearing from Cabezas-Montano's counsel, the district court denied Cabezas-Montano's downward-variance request.

Palacios-Solis and his counsel went next. The district court overruled Palacios-Solis's objections to the PSR's factual basis, noting that it had heard the trial evidence and found that the evidence supported that factual basis. Palacios-Solis again raised his mitigating-role objection, which the district court overruled

58

as well.  Palacios-Solis then raised his objection to the denial of safety-valve relief.

Although claiming he met the first four requirements of the safety valve, Palacios-Solis conceded that he did not meet the fifth requirement (to provide the government with information about his offenses), but argued that the fifth requirement violated his right against self-incrimination under the Fifth Amendment.  The district court observed that Palacios-Solis did not provide all he knew about the case and lied about his role at trial and in any event controlling precedent foreclosed his Fifth Amendment challenge.  The district court overruled the safety-valve objection.

Palacios-Solis also challenged his obstruction-of-justice increase and argued he did not lie at trial.  Overruling the objection, the district court found that Palacios-Solis testified about being adrift for about 30 days, that the Coast Guard expert testified that this story was physically impossible, and that there was plenty of evidence that the defendants attempted to conceal and destroy evidence during the chase.

Palacios-Solis also raised his request for a downward variance to the 120-month statutory mandatory minimum sentence.   The district court denied his request.  After ruling on each of Palacios-Solis's PSR objections, the district court found that his total offense level was 42, his criminal history category was I, and his advisory guidelines range was 360 months to life.

Guagua-Alarcon and his counsel went last, but noted that his only remaining objection was to not receiving the minor-role reduction, which the district court overruled.[33]  The district court found that Guagua-Alarcon's total offense level was 38, his criminal history category was I, and his advisory guidelines range was 235 to 293 months.

## E.    Counsel's Final Sentencing Arguments

After the defendants' personal allocutions,[34] their counsel presented arguments for sentences well below the guidelines range.  For example, the defendants argued that a shorter term of U.S. imprisonment would better promote general deterrence because they could go home and relay what happened.  They also argued that: (1) they came from poverty and had a poor education; (2) the large drug quantity was irrelevant because they had no control over the amount transported; (3) they would not do well in a U.S. prison as non-English speakers with no family or support system here; and (4) a within-guidelines-range sentence would be extreme and unwarranted.  Cabeza-Montano's counsel also stressed that,

---

[33]At this juncture, Guagua-Alarcon did not mention his motion for a downward variance but appeared to assume the district court had already denied his motion too when the district court denied those of Cabezas-Montano and Palacios-Solis.

[34]In allocution, Cabezas-Montano stated that he was concerned about his family's welfare and asked to be deported back to his home country.  Palacios-Solis stressed that there was no cocaine found on the defendants' vessel, that they were asleep when the Coast Guard apprehended them, and that he was concerned about his inability to provide for his family, and he asked for mercy.  Guagua-Alarcon maintained his innocence, denied being involved with cocaine, and asked to be deported back to his home country to be with his family.

in two of his other MDLEA cases, his clients had been found guilty after a trial but nevertheless were granted large downward variances and received sentences between 120 and 188 months' imprisonment.

In opposing 120-month sentences, the government argued that sentences must have meaning and that if a defendant goes to trial, loses, and then receives a downward variance to the bare statutory mandatory minimum sentence of 120 months, there would be no incentive for defendants to take responsibility for their criminal actions. The government noted that only one district court judge had granted the downward variances Cabezas-Montano's counsel referred to and that none of the judges in the district who presided over MDLEA cases had ever given a minor-role reduction, whether the defendants pled guilty or went to trial. The government emphasized that the defendants' advisory guidelines ranges were reasonable and requested 240-month sentences for Cabezas-Montano and Guagua-Alarcon and at least a 360-month sentence for Palacios-Solis.

## F.    District Court's Sentences

The district court then addressed the § 3553(a) factors. The district court explained that it had presided over several MDLEA cases in the past and would seek to be consistent with himself, rather than with other judges, especially given the defendants' advisory guidelines ranges in this case. The district court noted: (1) the large quantity of drugs involved in this case; (2) the drugs were valued at

many millions of dollars; (3) there had been an uptick in MDLEA cases recently; and (4) these drug trafficking operations have a profound impact on U.S. communities and law enforcement.  The district court observed that, in order to promote respect for the law and to provide deterrence, "the message needs to be sent home to these individuals who are contemplating engaging in this kind of criminal behavior, that the United States intends on doing something about" drug trafficking.  The district court explicitly stated that it considered the parties' statements, the PSRs containing the advisory guidelines ranges, and the § 3553(a) factors.  The district court determined that, for each defendant, sentences at the lower end of the advisory guidelines range would provide sufficient punishment and deterrence.

The district court sentenced: (1) Cabezas-Montano and Guagua-Alarcon to 240 months' imprisonment, concurrently on both counts; and (2) Palacios-Solis to 360 months' imprisonment, concurrently on both counts. The defendants renewed all prior objections, but made no new objections.

## XII. SAFETY-VALVE RELIEF

Turning back to the arguments on appeal, Palacios-Solis and Cabezas-Montano challenge the constitutionality of the "safety-valve" provisions of 18

62

U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.[35]  They concede, however, that they are not eligible for safety-valve relief because, at the time of their MDLEA convictions under Title 46, no Title 46 offense was covered by the safety valve in § 3553(f) or § 5C1.2.  See United States v. Pertuz-Pertuz, 679 F.3d 1327, 1328 (11th Cir. 2012) (holding that, because no Title 46 offense appeared in the plain terms of the safety valve, defendants convicted under Title 46—which includes MDLEA offenses— were not eligible for safety-valve relief).[36]

Further, this Court has held that the safety valve's prior exclusion of Title 46 defendants does not violate the Fifth Amendment's Equal Protection Clause.

---

[35]We review de novo a district court's interpretation of a statute and whether a statute is constitutional.  Valois, 915 F.3d at 722 n.1.

[36]Congress recently amended § 3553(f) to add MDLEA offenses to the list of crimes eligible for safety-valve relief.  See First Step Act of 2018, Pub. L. No. 115-391, § 402(a)(1)(A)(ii), 132 Stat. 5194, 5221 (2018).  However, Congress made the amendment applicable to convictions entered on or after the date of enactment, December 21, 2018.  First Step Act § 402(b), 132 Stat. at 5221.  That amendment thus does not apply to the defendants in this case because they were convicted in 2017.

The prior version of § 3553(f) in effect in 2017 provided that, "in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. [§§] 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. [§§] 960, 963), the court shall impose a sentence pursuant to guidelines . . . without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that" the defendant has met five requirements.  18 U.S.C. § 3553(f) (effective May 27, 2010, to Dec. 20, 2018).  Importantly, the fifth requirement was that, "not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan."  Id. § 3553(f)(5).

Similarly, § 5C1.2 provides that, "in the case of an offense under 21 U.S.C. § 841, § 844, § 846, § 960, or § 963, the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5)."  U.S.S.G. § 5C1.2(a).  Both provisions are known as the "safety valve."  United States v. Johnson, 375 F.3d 1300, 1302 (11th Cir. 2004).

Castillo, 899 F.3d at 1212-13; see also Valois, 915 F.3d at 729 (following Castillo and reaching the same holding).  In doing so, we applied rational-basis review and concluded that Congress had "legitimate reasons to craft strict sentences for violations of the [MDLEA]."  Castillo, 899 F.3d at 1213.  We highlighted the "pressing concerns about foreign relations and global organizations" and the difficulties inherent in policing "drug trafficking on the vast expanses of international waters."  Id.  Palacio-Solis's and Cabezas-Montano's equal-protection challenges to the safety-valve thus are foreclosed by Castillo.

Palacio-Solis and Cabezas-Montano also contend that the safety-valve's fifth requirement—that defendants provide information to the government about their offenses—violates their Fifth Amendment right against self-incrimination.  "[T]his Court has not addressed in a published opinion this Fifth Amendment issue as to the safety valve."  See Valois, 915 F.3d at 730.  In Valois, we briefly discussed the issue but ultimately did not decide it.  Id.  Namely, we pointed out that, in United States v. Henry, 883 F.2d 1010, 1011 (11th Cir. 1989), this Court concluded that "U.S.S.G. § 3E1.1, the acceptance-of-responsibility provision of the Guidelines, does not violate the Fifth Amendment right against self-incrimination."  Valois, 915 F.3d at 730 (explaining that "[s]ection 3E1.1(a) is not a punishment; rather, the reduction for acceptance of responsibility is a reward for those defendants who express genuine remorse for their criminal conduct" (quotation marks omitted)).

64

We also pointed out that "[s]everal of our sister circuits have concluded that the same is true for the safety valve in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2(a)." Id. (citing United States v. Warren, 338 F.3d 258, 266-67 (3d Cir. 2003); United States v. Cruz, 156 F.3d 366, 374 (2d Cir. 1998); United States v. Washman, 128 F.3d 1305, 1307 (9th Cir. 1997); United States v. Arrington, 73 F.3d 144, 149-50 (7th Cir. 1996)).

Nevertheless, in Valois, we declined to decide the issue given our conclusions that safety-valve relief was unavailable to the Title 46 MDLEA defendants in that case and that such unavailability did not violate the Equal Protection Clause and is constitutional. Id. Similarly, here, because Palacio-Solis and Cabezas-Montano are not eligible for safety-valve relief in the first place, we need not consider these defendants' claim that the substantive requirements for safety-valve relief violate their Fifth Amendment right against self-incrimination. See id.

## XIII. PROCEDURAL AND SUBSTANTIVE REASONABLENESS

All defendants raise various procedural and substantive reasonableness arguments related to their sentences. Generally, we review the reasonableness of a sentence under a deferential abuse-of-discretion standard using a two-step process. United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008). First, we look at whether the district court committed any significant procedural error, such as

65

miscalculating the advisory guidelines range, treating the guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to explain adequately the chosen sentence.[37]  Id.  Then, we examine whether the sentence is substantively unreasonable in light of the § 3553(a) factors and the totality of the circumstances.  Id.  The defendants, as the parties challenging their sentences, bear the burden to show that their sentences are unreasonable.  Id. at 1189.

## A.    Minor-Role Reduction

All three defendants argue that the district court erred in denying them a two-level minor-role reduction under U.S.S.G. § 3B1.2(b).[38]

Section 3B1.2(b) provides that a defendant is entitled to a two-level decrease in his offense level if he was a "minor participant in any criminal activity." U.S.S.G. § 3B1.2(b).  A defendant is a "minor participant" if he was "less culpable

---

[37]The § 3553(a) factors include, of relevance: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public from the defendant's future crimes; (5) the sentencing guidelines range; and (6) the need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a)(1)-(2), (4), (6).

[38]"We review a district court's denial of a role reduction for clear error." Valois, 915 F.3d at 730 n.8.  This Court will not disturb a district court's findings regarding the denial of a role reduction "unless we are left with a definite and firm conviction that a mistake has been made." Id. at 731.  "The court's choice between two permissible views of the evidence will rarely constitute clear error, so long as the basis of the trial court's decision is supported by the record and the court did not misapply a rule of law." Id.  The defendant bears the burden of establishing, by a preponderance of the evidence, his minor role in the offense. Id.

66

than most other participants in the criminal activity," but his role "could not be described as minimal." Id. § 3B1.2, cmt. n.5.  In determining whether a defendant is entitled to a minor-role reduction, the district court must consider the totality of the circumstances and the facts of the particular case.  Id. § 3B1.2, cmt. n.3(C).

In United States v. De Varon, this Court established two principles to "guide the determination of whether a defendant played a minor role in the criminal scheme: (1) 'the defendant's role in the relevant conduct for which [he] has been held accountable at sentencing,' and (2) '[his] role as compared to that of other participants in [his] relevant conduct.'"  United States v. Presendieu, 880 F.3d 1228, 1249 (11th Cir. 2018) (quoting United States v. De Varon, 175 F.3d 930, 940 (11th Cir. 1999) (en banc)).  "In making the ultimate finding as to role in the offense, the district court should look to each of these principles and measure the discernable facts against them."  De Varon, 175 F.3d at 945.

In De Varon, this Court pointed to these examples of relevant factors for the district court to consider in the drug courier context: "amount of drugs, fair market value of drugs, amount of money to be paid to the courier, equity interest in the drugs, role in planning the criminal scheme, and role in the distribution."  Id. (stressing that this is a non-exhaustive list, wherein no one factor is more important than another).  This determination is highly fact-intensive and "falls within the sound discretion of the trial court."  Id.

67

The amended commentary to § 3B1.2 presents a non-exhaustive list of factors "[s]imilar to the fact-intensive, multi-faceted approach this Court established in De Varon."  Presendieu, 880 F.3d at 1249; see also Cruickshank, 837 F.3d at 1193 (explaining that the purpose of Amendment 794 to the commentary to § 3B1.2 was to "further clarify the factors for a court to consider for a minor-role adjustment" in a way that "still continue[s] to embrace the approach we took in De Varon").  These factors include: (1) "the degree to which the defendant understood the scope and structure of the criminal activity"; (2) "the degree to which the defendant participated in planning or organizing the criminal activity"; (3) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority"; (4) "the nature and extent of the defendant's participation in the commission of the criminal activity"; and (5) "the degree to which the defendant stood to benefit from the criminal activity."  U.S.S.G. Supp. to App. C, Amend. 794; U.S.S.G. § 3B1.2, cmt. n.3(C) (2015).

"The court must consider all of [the § 3B1.2] factors to the extent applicable, and it commits legal error in making a minor role decision based solely on one factor."  Valois, 915 F.3d at 732 (quotation marks omitted); see, e.g., Cruickshank, 837 F.3d at 1194-95 (concluding that, "although nothing in De Varon or Amendment 794 [to § 3B1.2's commentary] precludes a district court from

considering the drug quantity with which the defendant was involved as an indicator of his role, we think it was legal error for the district court to say that this is the only factor to be considered in a case like this one").

Here, based on the totality of the circumstances, the district court did not clearly err in denying the defendants' request for a minor-role reduction. Under De Varon's first principle, the inquiry is whether the defendant "played a relatively minor role in the conduct for which [he] has already been held accountable—not a minor role in any larger criminal conspiracy." De Varon, 175 F.3d at 944; United States v. Martin, 803 F.3d 581, 591 (11th Cir. 2015). The record shows that all three defendants knowingly participated in the illegal transportation of a large quantity of high-purity and high-value cocaine, that they and their transportation roles were important to that scheme, and that they were held accountable for that conduct only. See U.S.S.G. § 3B1.2, cmt. n.3(C); De Varon, 175 F.3d at 941-43; see also United States v. Monzo, 852 F.3d 1343, 1347 (11th Cir. 2017) (considering, as part of the totality of the circumstances, that the defendant "participated in the distribution of high-purity [drugs], . . . that he was responsible only for his direct role in the conspiracy, and that he was important to the scheme").

While these facts do not render the defendants ineligible for the minor-role reduction, they support the district court's denial of the reduction. Further, the fact

that the defendants' transportation roles—moving a large quantity of high-purity cocaine through international waters—were important, and indeed critical, to the drug trafficking scheme was relevant to the fourth factor in § 3B1.2's commentary about the nature of the defendants' participation in the criminal activity. See U.S.S.G. § 3B1.2, cmt. n.3(C). That the defendants each were to receive $20,000 for their significant transportation roles showed the defendants stood to benefit from the criminal act, which is the fifth factor in § 3B1.2's commentary. See id.

In addition, under De Varon's second principle, the record indicates that none of the defendants were "less culpable than most other participants in the criminal activity." U.S.S.G. § 3B1.2, cmt. n.5. If anything, Palacios-Solis was the most culpable of the three defendants because, as he testified, he was the captain of the vessel. While Cabezas-Montano and Guagua-Alarcon appear to have had less of a role than Palacios-Solis, that fact alone does not make them minor participants. "The fact that a defendant's role may be less than that of other participants engaged in the relevant conduct may not be dispositive of role in the offense, since it is possible that none are minor or minimal participants." De Varon, 175 F.3d at 944. Simply put, the three defendants here did not carry their burden to show how they were less culpable than "most other participants" in the criminal activity, as they presented no supporting evidence at trial or at sentencing. See U.S.S.G. § 3B1.2, cmt. n.5; Valois, 915 F.3d at 731.

70

The defendants do principally argue that they were less culpable than other participants in the larger conspiracy, such as those who recruited and trained the defendants, those who planned the scheme, and those with a financial interest in the drugs. In this vein, the defendants argue that the district court denied them minor-role adjustments solely because the other participants were not charged and the defendants were held accountable only for the drug amounts charged against them.

Subsequent amendments to the Sentencing Guidelines clarify that, "[i]n considering a § 3B1.2 adjustment, a court must measure the defendant's role against the relevant conduct for which the defendant is held accountable at sentencing, whether or not other defendants are charged." See U.S.S.G. App. C, Amend. 635, Reason for Amendment. We also recognize the Sentencing Commission's statement, in agreement with our decision in De Varon, that "§ 3B1.2 does not automatically preclude a defendant from being considered for a mitigating role adjustment in a case in which the defendant is held accountable under § 1B1.3 solely for the amount of drugs the defendant personally handled." See id.

Nevertheless, the district court is not required to consider the culpability of any unknown conspirators or a hypothetical conspiracy. See De Varon, 175 F.3d at 944. This Court has explained that the district court should consider "other

71

participants only to the extent that they are identifiable or discernable from the evidence" and "may consider only those participants who were involved in the relevant conduct attributed to the defendant." Id. The trial evidence pointed to only the three defendants as participants involved in the relevant conduct that was attributed to each of them. The defendants submitted no evidence at trial or at sentencing regarding any other co-conspirators, let alone anyone who recruited or trained the defendants, plotted the offense, or owned the drugs. "Despite having the burden of proof, [the defendants] did not put forth evidence showing who else was involved or what their roles were. Without such evidence, the district court could not compare the roles of the other conspirators or 'determine that the defendant[s] w[ere] less culpable than most other participants in [their] relevant conduct.'" See United States v. Wright, 862 F.3d 1265, 1278 (11th Cir. 2017) (quoting De Varon, 175 F.3d at 944).

To the extent that the defendants argue that the district court denied them minor-role reductions on the sole ground that they were being held accountable for only their conduct and the drug amount on their vessel, the record shows that the district court considered not one but several grounds in denying the reduction. See U.S.S.G. App. C, Amend. 635, Reason for Amendment; Valois, 915 F.3d at 732. During the sentencing colloquy, Cabezas-Montano's counsel argued and the district court considered: (1) the defendants' argument that they were just the "little

72

guys" in a larger operation, rather than, as the district court put it, "big guy[s]" representing the owners of the cocaine; (2) how much money couriers stood to make in these operations; (3) the critical role of transportation within the drug trafficking industry; and (4) that the defendants were being held accountable under § 1B1.3 solely for the amount of drugs they personally handled. This discussion related to numerous factors outlined by De Varon and the commentary to § 3B1.2, and the defendants have failed to show that any of these factors was improper. See U.S.S.G. § 3B1.2, cmt. n.3(C); De Varon, 175 F.3d at 945.

Based on the totality of the circumstances and the record in this case, the district court did not clearly err in denying the defendants minor-role reductions under § 3B1.2.

**B.    18 U.S.C. § 3553(c)(1)**

Cabezas-Montano and Palacios-Solis argue that the district court procedurally erred under 18 U.S.C. § 3553(c)(1) because it "gave no indication or explanation" as to why it chose a sentence at the particular point in the advisory guidelines range or as to why a sentence at the low-end of that range was sufficient.[39] Under § 3553(c)(1), a district court "at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence." 18

---

[39]We review de novo whether the district court's explanation of its sentence complied with § 3553(c)(1), regardless of whether the defendant objected on such grounds at sentencing. United States v. Bonilla, 463 F.3d 1176, 1181 (11th Cir. 2006); United States v. Williams, 438 F.3d 1272, 1274 (11th Cir. 2006).

U.S.C. § 3553(c)(1).  In doing so, the district court should "tailor its comments to show that the sentence imposed is appropriate" in light of the § 3553(a) factors. United States v. Bonilla, 463 F.3d 1176, 1181 (11th Cir. 2006) (quotation marks omitted).

That said, the district court is not required to incant specific language or articulate its consideration of each individual § 3553(a) factor, so long as the whole record reflects the district court's consideration of the § 3553(a) factors.  Id. at 1181-82.  When the district court fails to mention the § 3553(a) factors, we look to the record to see if the district court did, in fact, consider the relevant factors.  See United States v. Dorman, 488 F.3d 936, 944 (11th Cir. 2007).  When pronouncing its chosen sentence, the district court need only set forth enough to satisfy us that it considered the parties' arguments and had a reasoned basis for exercising its own legal decisionmaking authority.  United States v. Carpenter, 803 F.3d 1224, 1232 (11th Cir. 2015).

Here, the record shows that the district court provided a sufficient explanation of its imposed sentences under § 3553(c)(1).  Before pronouncing its sentences, the district court judge expressly articulated that it had considered the parties' arguments, the PSRs containing the advisory guidelines ranges, and the § 3553(a) factors.  In the downward-variance arguments before the district court, the parties had also discussed the majority of the § 3553(a) factors—namely, the

74

nature and circumstances of the offenses, the defendants' histories and characteristics, the advisory guidelines ranges, and the needs for deterrence, to reflect the seriousness of the offenses, to protect the public, and to promote respect for the law. Though the district court did not discuss the defendants' individual circumstances, the district court stated it had considered the parties' arguments and the PSRs, both of which contained discussions of the defendants' individual circumstances. That is sufficient. See Bonilla, 463 F.3d at 1181; United States v. Irey, 612 F.3d 1160, 1194-95 (11th Cir. 2010) (en banc) (explaining that the district court need not discuss each individual factor on the record).

In fact, the district court provided a sufficiently in-depth explanation of its sentences, explicitly highlighting several § 3553(a) factors, including: (1) the sentences given in other recent MDLEA cases in comparison to the applicable advisory guidelines ranges; (2) the seriousness of the defendants' drug trafficking crime, which involved a large quantity of drugs with high monetary value; and (3) the needs to promote respect for the law, to protect the public, and for deterrence, given the recent uptick in MDLEA cases and their profound impact on communities and law enforcement. The district court stated that low-end guidelines range sentences would provide sufficient punishment and deterrence and sentenced Cabezas-Montano to 240 months' imprisonment (towards the bottom of the applicable 235-to-293 months advisory guidelines range) and

75

Palacios-Solis to 360 months' imprisonment (at the very bottom of the applicable 360-months-to-life advisory guidelines range).

Therefore, the district court complied with § 3553(c)(1)'s mandate to "state in open court the reasons for its imposition of the particular sentence."  18 U.S.C. § 3553(c)(1).  Cabezas-Montano and Palacios-Solis have not shown that the district court erred in explaining their sentences.  See Pugh, 515 F.3d at 1190; Bonilla, 463 F.3d at 1181.

## C.    Denial of Downward Variances

All defendants argue that, in denying their motions for a downward variance, the district court erroneously considered that they exercised their right to trial, thereby unconstitutionally penalizing them for exercising this right and violating § 3553(a).  The defendants allege that their decision to go to trial was the determining factor in the district court's decision to impose high sentences.

Generally, when a district court recognizes its authority to grant a variance, we review for abuse of discretion its decision not to grant a downward variance. United States v. Cubero, 754 F.3d 888, 897-98 & 897 n.8 (11th Cir. 2014). However, while the defendants moved for downward variances below, none raised any argument regarding the district court's alleged reliance on their exercise of their right to trial in denying the motions.  Thus, their new challenge on appeal is reviewed for plain error.  See Ramirez-Flores, 743 F.3d at 822.

76

"[T]he district court has considerable discretion in deciding whether the § 3553(a) factors justify a variance and the extent of such a variance." United States v. Croteau, 819 F.3d 1293, 1309 (11th Cir. 2016). "We give that decision due deference because the district court has an institutional advantage in making sentencing determinations." Cubero, 754 F.3d at 892 (quotation marks omitted).

Here, the record shows no error regarding the district court's denial of the defendants' downward-variance motions, let alone any plain error affecting their substantial rights. Cabezas-Montano and Guagua-Alarcon have not shown any error because, in denying their specific downward-variance motions, the district court never mentioned that they exercised their right to trial. Rather, in denying their motions, the district court: (1) rejected the defendants' argument that they were just the "little guys" in a larger operation; (2) rejected their argument that they and/or other couriers would be deterred from making future trafficking trips when the possible reward for a successful trip was so high; (3) noted that MDLEA penalties were significant because of the harm drug offenses wreak on society; and (4) found that each defendant was an essential member of the conspiracy.

It was not until Palacios-Solis raised his downward-variance argument— several pages of transcript after Cabeza-Montano's and Guagua-Alarcon's motions already were denied—that the district court made the complained-of comments. In denying Palacios-Solis's downward-variance motion, the district court commented:

77

Also, the motion for a downward variance, I think we're treading on some difficult waters if we come in and say—I mean, I think every defendant has an absolute right to go to trial and exercise it and understand what the consequences are.

But what I'm hearing from you and others in these types of cases is that the guideline amount of time is just a lot of time; so why not just give us the mandatory-minimum every time. So let us have two bites at the apple: Let us go to trial and maybe we'll be acquitted, we can all go home. And sometimes we have acquittals in these cases and sometimes we have mistrials.

But if we don't get acquitted, then at least give us the minimum-mandatory with a downward departure so that we can kind of hedge our bets. We want our cake and eat it. We don't want to have to face the guideline sentence. We want to go to trial and hopefully get acquitted. But if we do go to trial and we get convicted, then we want the mandatory-minimum. You know, if we start setting up that precedent, then everybody is going to want to roll the dice with one hand tied behind their back.

Anyway, I don't think a downward departure or variance is justified.

In making the comments, the district court made no reference to Cabeza-Montano or Guagua-Alarcon, or their motions.

Even if the district court's comments were made in reference to each of the defendants' downward-variance motions, the defendants still have not shown error. The defendants describe the district court's comments as denying their downward-variance motions solely in an effort to punish them for going to trial. The record does not support such a portrayal. Rather, the district court actually acknowledged the defendants' "absolute right to go to trial," and then the remainder of the district

78

court's comments were its efforts at characterizing the nature of Palacios-Solis's

argument for the statutory mandatory minimum sentence.  Notably, the district

court characterized Palacios-Solis's argument as being that, no matter what, a

defendant every time should still receive only the mandatory statutory minimum

sentence after trial because the length of the guidelines sentences in these types of

drug cases is "just a lot of time."  The district court rejected this argument and

stated, "Anyway, I don't think a downward departure or variance is justified,"

indicating that it was denying Palacios-Solis's motion on the merits, just as it had

earlier denied Cabeza-Montano's and Guagua-Alarcon's motions on the merits.

Thus, given the record as a whole, the defendants have not shown that the district

court's denial of their downward-variance motions was an effort to penalize them

for going to trial.

### D.    Substantive Reasonableness

Cabezas-Montano, and Palacios-Solis by adoption, argue that their sentences

are substantively unreasonable.[40]  Yet, when a district court imposes a sentence

within the advisory guidelines range, we ordinarily will expect the sentence to be a

reasonable one.  Carpenter, 803 F.3d at 1234; United States v. Docampo, 573 F.3d

1091, 1101 (11th Cir. 2009).  Further, a district court may attach great weight to

one factor over others, and the weight it attaches to any one factor is committed to

---

[40]The record does not indicate that Guagua-Alarcon has adopted this argument.

79

its sound discretion. United States v. Rosales-Bruno, 789 F.3d 1249, 1254 (11th Cir. 2015).

Under the abuse-of-discretion standard, we will vacate a sentence on substantive reasonableness grounds only if "we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Irey, 612 F.3d at 1190 (quotation marks omitted). We will not "set aside a sentence merely because we would have decided that another one is more appropriate" and we ensure only that the district court's sentence is a reasonable one. Id. at 1191.

Here, Cabezas-Montano's 240-month sentence falls near the bottom of the 235-to-293-month advisory guidelines range, a strong indication of reasonableness. See Carpenter, 803 F.3d at 1234; Docampo, 573 F.3d at 1101. Similarly, Palacios-Solis's 360-month sentence falls at the very bottom of the 360-months-to-life advisory guidelines range, also suggesting reasonableness. See id. Nevertheless, they argue that their within-guidelines-range sentences are still substantively unreasonable because the district court considered only the seriousness of the defendants' offenses and the need to promote general deterrence and failed to consider (1) their individual histories and circumstances, and (2) the sentences imposed by different judges on similarly situated defendants in Cabezas-

80

Montano's counsel's other MDLEA cases.

While the district court did not expressly discuss these defendants' individual histories and circumstances, the record belies their assertion that it did not consider them.  As outlined above, the district court explicitly considered the defendants' PSRs and downward-variance arguments, and it also heard their allocutions, all of which reflected their individual histories and characteristics.  Namely, Cabezas-Montano and Palacios-Solis highlighted their familial relationships in Colombia and Ecuador, guilt and remorse from being separated from their family members, poverty, efforts to support their families as low-income fishermen, lack of prior crimes, and alleged minor roles in the offense.  Similarly, the district court heard Cabezas-Montano's counsel's arguments regarding the large downward variances received by purported similarly situated MDLEA defendants in his other cases, heard the government's opposing argument that only one district court judge had granted those large downward variances, and even asked the parties clarifying questions about those other cases.  The district court was not required to discuss these factors in more detail.  See Irey, 612 F.3d at 1194-95.

Cabezas-Montano and Palacios-Solis also contend that the district court imposed a within-guidelines-range sentence based on the highest drug quantity and did not meaningfully distinguish their individual conduct from that of a "drug

81

kingpin." This contention is unsupported, speculative, and ignores that the district court sentenced Cabezas-Montano at the low-end of his applicable advisory guidelines range and his total sentence was 120 months less than his more culpable codefendant, Palacios-Solis, who admitted to being the vessel's captain. And given Palacios-Solis's role as the captain, we cannot say the district court erred in imposing his low-end 360-month guidelines sentence.

While Cabezas-Montano and Palacios-Solis focus on their individual histories and circumstances and the sentences received by purported similarly situated defendants in other MDLEA cases, these are only two factors in the § 3553(a) analysis. See 18 U.S.C. § 3553(a)(1), (6). The district court was well within its substantial discretion to weigh more heavily other considerations, like: (1) the applicable advisory guidelines range; (2) the seriousness of the defendants' high-quantity and high-value drug trafficking crime; and (3) the needs to promote respect for the law, to protect the public, and for deterrence, given the prevalence and profound impact of MDLEA cases. See id. § 3553(a)(1)-(2), (4); Rosales-Bruno, 789 F.3d at 1254.

All in all, Cabezas-Montano and Palacios-Solis have failed to show that "the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of [this] case." See Irey, 612 F.3d at 1190 (quotation marks omitted).

82

83

## XIV. CONCLUSION

For the reasons discussed above, we affirm the defendants' convictions and sentences.

**AFFIRMED.**

ROSENBAUM, Circuit Judge, concurring:

I concur in the panel's opinion but write separately to address two points. First, I am deeply troubled that the government took seven weeks between arresting the defendants and bringing them before a magistrate judge for a probable-cause determination. And second, I am concerned that one of our holdings in *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991), on which the panel opinion relies, is incorrect. While I urge the Court to reconsider that holding *en banc* in an appropriate case, I do not think our error in *Riviera* affects the ultimate outcome here.

## I.

The government is fortunate that the defendants did not raise the Coast Guard's apparent seven-week odyssey in the district court.[1]   Had the defendants done so, the government would have had to establish under Rule 5(a)(1)(B), Fed. R.

---

[1] The map below shows the point where the Coast Guard encountered the defendants, southwest of El Salvador, and the place to which the Coast Guard took the defendants, Key West, Florida.



84

Crim. P., that its seven-week delay was not "unnecessary." Since the defendants did not press this claim in the district court, though, we have no information about the reason for the delay, so we cannot say the district court plainly erred in not, on its own, realizing that a seven-week delay occurred and finding that the delay was unnecessary.

But seven weeks! That's a long time. Christopher Columbus's first voyage across the entire Atlantic Ocean, from the Canary Islands to the Bahamas, took only roughly five weeks. *How Long Did It Take Columbus and His Crew to Cross the Atlantic*, Reference, https://www.reference.com/history/long-did-columbus-his-crew-cross-atlantic-ocean-81eb6768c230a21c (last visited Jan. 27, 2020). And in 1873, Jules Verne contemplated a voyage around the whole world (by sea and rail) would take only 80 days. In fact, Nellie Bly[2] beat his estimate in 1890 by completing the journey in 72 days, six hours, eleven minutes, and fourteen seconds.[3] It's hard

---

[2] Nellie Bly was born Elizabeth Jane Cochran. She began using the pseudonym Nellie Bly when she started writing for the *Pittsburgh Dispatch*. Arlisha R. Norwood, *Nellie Bly*, National Woman's History Museum, https://www.womenshistory.org/education-resources/biographies/nellie-bly (last visited Jan. 27, 2020). At a time when women were not welcomed as reporters, Bly's work established her as one of the most well-known journalists in the country. *Id.* Among her groundbreaking work, Bly helped pioneer the field of investigative journalism, going undercover as a mentally ill person to investigate the notorious insane asylum on Blackwell's Island (now Roosevelt Island). *Id.* As a result of Bly's exposé for the *New York World* on her time at the asylum, the New York District Attorney's Office undertook a major investigation of the facility, culminating in significant changes in New York City's Department of Public Charities and Corrections. *Nellie Bly*, Biography (Nov. 6, 2019), https://www.biography.com/activist/nellie-bly (last visited Jan. 27, 2020).

[3] *Jan 25, 1890 CE: Around the World in 72 Days*, National Geographic, https://www.nationalgeographic.org/thisday/jan25/around-world-72-days/ (last visited Jan. 27, 2020); *129 years ago, Nellie Bly passed through Lancaster on her '72 days around the world',*

85

to believe that the Coast Guard, nearly 126 years later, needed 70% of Bly's travel period to go only between Central and North America.

Surely at some point a delay becomes presumptively "unnecessary," even by plain-error standards.  Perhaps we cannot say definitively that seven weeks for this trip is presumptively "unnecessary," but what if the Coast Guard had taken an extra month?  What about an entire year?  The government might be able to explain such delays—and again, we have no record in this case—but a lengthy trip like this raises more than a few questions.

Plus, if the government could have delivered the defendants to a closer jurisdiction in less time, it seems to me that Rule 5(a)(1)(B) required it to do so— regardless of the fact that 46 U.S.C. § 70504(b)(2) allows an alleged MDLEA offender to "be tried in any district," "if the offense was begun or committed upon the high seas."  Any delay occasioned by shipping the defendants to a further jurisdiction, for forum-shopping purposes (as the defendants assert), certainly would have been "unnecessary."[4]

In addition to violating Rule 5, "unnecessary" delay in presentment may also be unconstitutional.  True, the Supreme Court has suggested that the Fourth

---

LancasterOnline, https://lancasteronline.com/features/years-ago-nellie-bly-passed-through-lancaster-on-her-days/article_01fe8868-1e8d-11e9-9be8-13475110aeb6.html (last visited Jan. 27, 2020).

[4] Once again, though, the problem here is that the record is devoid of evidence that, under the marine conditions at the time of the journey, any other jurisdiction would have been materially closer than Key West, so we cannot find plain error on that basis on this record.

Amendment "has no application" outside the United States to "a citizen and resident of [a foreign country] with no voluntary attachment to the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1989). But that does not mean that the Constitution does not constrain the government's powers at all. "Even when the United States acts outside its borders, its power are not absolute and unlimited but are subject to such restrictions as are expressed in the Constitution." *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (cleaned up).

Depending on the necessity for the length of the detention during the delay in presentment, one of those limitations may include the Suspension Clause. The Supreme Court has explained that the writ of habeas corpus is "an essential mechanism in the separation-of-powers scheme." *Id.* at 743. That is so since habeas "preserves limited government" by allowing a detainee to challenge his detention when a branch of the government has exceeded its constitutional powers in imprisoning him. *See id.* at 744. And since "the Constitution's separation-of-powers structure, like the substantive guarantees of the Fifth and Fourteenth Amendments, protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-power principles" such as the Suspension Clause. *Id.* at 743 (citations omitted); *cf. Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) ("An alien immigrant, prevented from landing by any such officer claiming authority to do so under an act of congress, and thereby

87

restrained of his liberty, is doubtless entitled to a writ of *habeas corpus* to ascertain whether the restraint is lawful.").

The Supreme Court has concluded that we must consider at least three factors in evaluating the reach of the Suspension Clause:  "(1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ."  *Boumediene*, 553 U.S. at 766.  When we do so, it seems likely that the Suspension Clause applies to foreign-national criminal detainees in sole United States custody before they have been charged—even if the United States is holding them outside this country.

To understand why, we must review *Boumediene*.  In *Boumediene*, the petitioners were aliens designated as enemy combatants and detained at the United States Naval Station at Guantanamo Bay, Cuba.  *Id.* at 732.  They denied they were enemy combatants and sought the issuance of writs of habeas corpus for their release.  *Id.* at 734.  Applying the three factors listed above, the Supreme Court concluded that the *Boumediene* petitioners could seek habeas in United States courts, since Congress had not acted in conformance with the requirements of the Suspension Clause when it enacted a statute stripping the courts of jurisdiction to issue the writ.  *Id.* at 766-771, 792.

88

With respect to the first factor—the citizenship and status of the detainee and the adequacy of the process through which that status determination was made—the Court noted that the detainees were not American citizens but emphasized that they objected to their characterization as enemy combatants. *Id.* at 766. For that reason, the Court examined the procedural protections the detainees received in the hearings where the government determined them to be enemy combatants. *Id.* at 766-67. In so doing, the Court concluded that these protections—where the detainee received a "personal representative" (though not a lawyer or advocate) and was able to present "reasonably available evidence"—fell "well short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review." *Id.* at 767

Turning to the second consideration—the nature of the sites where apprehension and then detention occurred—the Court observed that the detainees had been taken into custody outside the United States and detained in a place that is "technically outside the sovereign territory of the United States." *Id.* at 768. Though these facts weighed against a finding that the detainees had rights under the Suspension Clause, the Court chose to instead stress that the United States enjoyed absolute and indefinite control over the facility at Guantanamo Bay. *Id.* at 768-69. As a result, the Court reasoned that "[i]n every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States." *Id.* at 769.

As to the third factor—the practical obstacles inherent in resolving the prisoner's entitlement to the writ—the Court first conceded "that there are costs to holding the Suspension Clause applicable in a case of military detention abroad." *Id.* at 769. Nevertheless, it did not find the costs dispositive. *Id.* Rather, the Court focused on the government's lack of credible arguments that the military mission at Guantanamo would be "compromised" if United States courts heard the detainees' habeas claims. *Id.* It further noted that it had no reason to believe that adjudicating a habeas corpus petition would somehow upset Cuba. *Id.* at 770. And finally, it observed that "the United States is, for all practical purposes, answerable to no other sovereign for its acts" on Guantanamo. *Id.* Indeed, the Court recognized, the detainees were "held in a territory that, while technically not part of the United States, [was] under the complete and total control of our Government." *Id.* at 771.

The case of MDLEA detainees in the Coast Guard's sole custody on the high seas is even more compelling. First, at the time they are detained on the Coast Guard's vessel, MDLEA arrestees, unlike Guantanamo detainees, receive no process at all. They do not enjoy a proceeding of any type to determine whether the Coast Guard has correctly concluded that probable cause supporting their arrest and detention exists until after their detention on the high seas ends; they cannot present evidence contesting their detention; and they do not receive "personal representatives." If the process available to the Guantanamo detainees did not

90

satisfy the Suspension Clause, then certainly the absence of process altogether cannot.

Second, while Coast Guard vessels on the high seas are not within the jurisdiction of the United States, as with Guantanamo, the United States enjoys absolute and indefinite control over its own ships while they are in international waters.

And finally, like the detainees at Guantanamo, MDLEA detainees onboard a Coast Guard ship operating in international waters also are "under the complete and total control of our Government."  For these reasons, it seems likely that, at least theoretically,[5] an MDLEA detainee onboard a government vessel for an unnecessary period enjoys the right to seek habeas corpus in a court of the United States.

In any case, at a minimum, the United States should give some serious consideration to its procedures for presenting an MDLEA detainee arrested in international waters.  In the absence of a very good reason, detaining a person on the high seas for seven weeks before formally charging him with a crime is just wrong.

## II.

---

[5] As a practical matter, such a right may not amount to much.  While an MDLEA detainee is in custody on a government vessel—even assuming he has the knowledge to prepare a petition seeking habeas—he may not have a way to actually file such a petition.  As a result, an MDLEA detainee's habeas rights might rely on whether others have knowledge of the detention and are in a position to be able to file a habeas petition on behalf of the detainee.  Of course, even if, as a practical matter, a remedy is unattainable, that does not relieve the government of its obligation to comply with the Constitution.

Next, though I recognize that we are bound by *Rivera*, I respectfully disagree with its holding that, in the government's case in chief, the government may present testimony or otherwise comment on a defendant's silence when the defendant was in custody but before he received his *Miranda*[6] warnings. *Rivera*, 944 F.2d at 1568.

As I read *Miranda*, its purpose was to avoid precisely this result. In fact, *Miranda* described its own holding as follows: "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from ***custodial interrogation*** of the defendant unless it demonstrates the use of [*Miranda* rights] effective to secure the privilege against self-incrimination." 384 U.S. at 444 (emphasis added). The Supreme Court noted, "[T]here can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way . . . ." *Id.* at 467. *Miranda* further explained that the reading of *Miranda* rights must occur "[p]rior to any questioning" because the rights are designed "to inform accused persons of their ***right of silence*** and to ***assure a continuous opportunity to exercise it***[.]" *Id.* at 444 (emphasis added).

If an in-custody person's silence before the administration of *Miranda* rights may be used against that person, then, in violation of *Miranda*, that person is not "assured a continuous opportunity to exercise" his right of silence while subject to

---

[6] 384 U.S. 436 (1966).

the "inherently compelling pressures" of unwarned custodial interrogation. *See Salinas v. Texas*, 570 U.S. 178, 184 (2013) (plurality opinion) (quoting *Miranda*, 384 U.S. at 467-68 & n.37). As a result, allowing a detainee's silence while in custody, but before administration of this procedure, to be used against that person in the government's case in chief eviscerates the purpose of *Miranda*. Admissibility of in-custody, pre-*Miranda* silence in response to an officer's questions or comments also rewards the delayed administration of *Miranda* rights, so it can encourage law enforcement to engage in such a practice.

Not only is our *Rivera* holding contrary to *Miranda*, but *Fletcher v. Weir*, 455 U.S. 603 (1982), the sole authority on which we relied in reaching our *Rivera* holding, cannot bear the weight we have thrust upon its shoulders. In *Fletcher*, the Supreme Court held only that using in-custody, pre-*Miranda* silence *to impeach* a defendant who has taken the stand does not violate due process. *Id.* at 607. The Court never endorsed or even suggested that due process condones relying on a defendant's in-custody, pre-*Miranda* silence in the government's case in chief.

In particular, to justify the rule in *Fletcher*, the Court invoked common law, noting that it "traditionally has allowed witnesses to be *impeached* by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." *Fletcher*, 455 U.S. at 606 (citation and internal quotation marks omitted) (emphasis added). Our *Rivera* analysis cites no common-law authority for the

93

proposition that in-custody, pre-*Miranda* silence may be used against a defendant in the government's case in chief. Nor does it explain why the fact that the common law authorized admissibility of such reticence for impeachment purposes somehow means that in-custody, pre-*Miranda*-rights silence may also be used against a defendant in the government's case in chief.

And the Supreme Court's more recent caselaw—*Salinas*, 570 U.S. 178 (plurality opinion)—undermines our holding in *Rivera*. In *Salinas*, the Supreme Court held that in *non-custodial* settings (before *Miranda* warnings are issued), a person who wishes to rely on his right to remain silent must expressly invoke that right. *Id.* at 190 (plurality opinion). But significantly, the Court noted that "a witness' failure to invoke the privilege must be excused where governmental coercion makes his forfeiture of the privilege involuntary." *Id.* at 184 (plurality opinion). Citing to *Miranda*, 384 U.S. at 467-68 & n.37, the Court then went on to explain that "a suspect who is subjected to the inherently compelling pressures of an unwarned custodial interrogation need not invoke the privilege." *Id.* (internal quotation marks omitted). In other words, as recently as 2013, the Court reaffirmed *Miranda*'s principle that an in-custody person's silence, pre-*Miranda* rights, may not be used against him, even if he does not expressly invoke his right to remain silent.

94

For these reasons, I respectfully disagree with our holding in *Rivera* authorizing the use of an arrestee's silence against him, pre-*Miranda* rights. And I urge my colleagues to reconsider this rule *en banc*.

Nevertheless, I think that use of the defendant's in-custody, pre-*Miranda*-rights silence does not affect the outcome here.

First, to the extent that the government relied on the defendants' silence here to establish subject-matter jurisdiction under the MDLEA, that was not error, even if *Rivera* is wrong. "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 189 (2004). The privilege covers testimony that would either directly "support a conviction under a federal criminal statute" or merely "furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime[.]" *Hoffman v. United States*, 341 U.S. 479, 486 (1951). But as the panel opinion points out, the "jurisdictional requirement is not an . . . essential element of the MDLEA substantive offense," *Tinoco*, 304 F.3d at 1109, so it need not be submitted to the jury for proof beyond a reasonable doubt. Panel Op. at 26 (collecting cases). As a result, an MDLEA detainee's testimonial communication (including silence) is not "incriminating" for the purposes of the Fifth Amendment's privilege against self-incrimination. More simply put, the government's use of an MDLEA detainee's silence to prove statutory subject-matter

jurisdiction has nothing to do with proving that the detainee substantively violated the MDLEA, so it does not implicate the Fifth Amendment.

And second, as it relates to the government's use of the defendants' silence as evidence of their guilt on the substantive charges of drug-trafficking, on this record, application of *Rivera*—even if, as I believe, it was wrongly decided—was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967). We have explained that "[o]verwhelming evidence of guilt" is relevant to assessing whether an error of constitutional dimension is harmless beyond a reasonable doubt. *United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999).

Here, the record is rife with such evidence. For starters, Palacios-Solis testified that the defendants were adrift at sea for 27 to 30 days. Yet when the Coast Guard encountered them, it found large amounts of water and sports drinks, as well as fresh fruit and food items that did not appear to be that old. Nor did the defendants show any signs of having been adrift at sea for four weeks. Plus, the bottom of the vessel was clean and free from growth, also belying the defendants' story. Besides that, while Palacios-Solis said the defendants had been on a fishing trip, the Coast Guard discovered no bait, fish, or fish remnants onboard. And the lines the Coast Guard did recover appeared to be unserviceable and not usable for fishing. Then there were the 25 bales of cocaine, located in a place consistent with the currents from where the defendants allegedly ditched them. Not only that, but the Coast

Guard found onboard the defendants' boat the same kind of buoy and black line recovered with the bales. The defendants also put gasoline on their boat's surface—a dangerous practice that did not appear to serve any legitimate purpose. Even so, though, the Coast Guard still found traces of cocaine onboard the defendants' boat.

In short, the defendants' silence in response to the Coast Guards' questions about the boat's captain and nationality pales in comparison to the torrent of other evidence the government presented of the defendants' guilt. As a result, even if *Rivera* wrongly authorizes admission of defendants' in-custody, pre-*Miranda*-rights statements—which, for the reasons I have explained, I think it does—allowing the government to rely in its case in chief on the defendants' silence here would not require reversal.